**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| **PAUL DAVIS,**<br><br>            **Plaintiff,**<br><br>      **v.**<br><br>**MEDXCEL FACILITIES<br>MANAGEMENT, LLC,**<br><br>            **Defendant.** | **Case No. 1:17-cv-00790-RLY-MJD** |

**DEFENDANT'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Defendant, Medxcel Facilities Management, LLC ("Medxcel" or "Defendant"), pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56-1 of the United States District Court for the Southern District of Indiana, submits the following Brief in Support of its Motion for Summary Judgment.

## I.        INTRODUCTION

Medxcel terminated Plaintiff Paul Davis ("Davis") after only 18 months of employment with Medxcel, because of repeated poor performance and client complaints, despite ongoing counseling, discipline, and performance improvement plans delivered by multiple managers and human resources in an attempt to help Davis improve his job performance. Specifically, Davis received verbal counseling, two written warnings, a performance improvement plan, and a poor annual review from two different managers, documenting his poor performance and detailing where he needed to show improvement. Nonetheless, Davis continued to demonstrate the same types of performance deficiencies that led to his earlier discipline. Consequently, Medxcel terminated Davis's employment on or around July 28, 2016. While he was employed with

Medxcel, Davis did not report or make any complaint or voice any concern that he was discriminated against based on his age, disability or medical condition. Davis's termination had nothing to do with his age or any alleged disability. Davis's claims to the contrary are unsupported by the facts.

Additionally, Medxcel properly classified Davis as an executive employee exempt from the overtime requirements set forth in the Fair Labor Standards Act ("FLSA") and the Indiana Wage Claims statute. Davis earned over $64,000 a year and was required to perform the duties of an executive employee. He was not entitled to time and a half compensation for any hours over 40 worked in a week. Davis's poor performance alone is no justification for paying him overtime compensation and Medxcel does not owe Davis for any unpaid wages. For those reasons, each of Davis's claims fails as a matter of law and Medxcel requests summary judgment be entered in its favor.

## II.   STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]

### A.   Davis's Employment Background and Job Duties.

Medxcel partners with hospitals and health care providers to manage their facility and maintenance operations. (Declaration of Eric Waller ("Waller Decl."), ¶ 4). St. Vincent Women's Hospital ("Women's Hospital") hired Davis as a Facilities Mechanic on or around June 19, 2006. (Deposition of Paul Davis ("Davis Dep.") at 17:20-18:4, 18:8-9, 22:23-23:2).[2] In or around 2013, St. Vincent promoted Davis to Facilities Supervisor. (Davis Dep. at 18:10-17, 23:10-13). Effective January 1, 2015, Medxcel assumed the responsibility for facilities

---

[1] For the purposes of summary judgment only, Medxcel interprets all facts in a light most favorable to Davis.

[2] Immediately prior to working at Women's Hospital, Davis had been terminated by a previous employer for failing to report a serious safety incident, resulting in an unoccupied building filling up with gas. (Davis Dep. at 15:1-24).

operations at Women's Hospital, and Davis's employment transferred to Medxcel. (Declaration of Zachary Matthews ("Matthews Decl."), ¶ 5; Waller Decl., ¶ 5). Davis retained his position as Facilities Supervisor at Medxcel. (Davis Dep. at 18:18-25). During Davis's tenure with Medxcel, he was the only Facilities Supervisor at Women's Hospital. (Davis Dep. at 23:10-13).

As Facilities Supervisor, Davis was expected to "provide general and day-to-day direction to management and hourly staff within the Facilities Management Department." (Davis Dep. at 36:19-37:4, 38:25-39:2 & Ex. 1; Deposition of Kenneth Gordon ("Gordon Dep.") at 112:10-15; Declaration of Jason Callis ("Callis Decl."), ¶¶ 7-8). His responsibilities included "[d]evelop[ing] and oversee[ing] staffing, training, scheduling, budgeting in the Facilities Management department." (Davis Dep. at Ex. 1; Gordon Dep. at 108:4-9, 108:16-18; Callis Decl., ¶¶ 7-8). While he performed some maintenance tasks himself, (Davis Dep. at 29:14-15), Davis's primary duty was to supervise and direct the work of the facilities technicians who reported to him. (Callis Decl., ¶ 8; Declaration of Daniel Lovelace ("Lovelace Decl."), ¶ 6).

While Davis was Facilities Supervisor, at least two facilities technicians reported to him at all times, including Larry Trivett ("Trivett") and Daniel Lovelace ("Lovelace"). (Davis Dep. at 21:2-11, 31:12-14, 32:17-33:2-16, 34:13-18, 80:4-14; Deposition of Mitchell Breeze ("Breeze Dep.") at 42:18-43:2; Callis Decl., ¶ 8; Lovelace Decl., ¶¶ 5-6). As a Facilities Supervisor, Davis had the following responsibilities:

- Review the timecards of the technicians who reported to him. (Davis Dep. at 30:1-3, 81:17-21; Breeze Dep. at 43:3-5; Callis Decl., ¶ 8; Lovelace Decl., ¶ 6).

- Direct the technicians to prioritize work orders and plan day-to-day tasks. (Davis Dep. at 48:7-49:11; Gordon Dep. at 114:13-19; Callis Decl., ¶ 7; Lovelace Decl., ¶ 6).

- Communicate with hospital leadership regarding maintenance projects and other issues. (Gordon Dep. at 114:25-115:8; Callis Decl., ¶ 7).

- Interview job applicants and recommend applicants for hire. (Davis Dep. at 51:24-52:2, 78:24-79:18; Callis Decl., ¶¶ 7-8).

- Contribute to the decision to terminate a technician, and communicate the decision to the technician directly. (Davis Dep. at 52:7-18; Callis Decl., ¶¶ 7-8).

- Discipline his subordinates in the form of verbal counselings. (Davis Dep. at 76:25-77:6; Breeze Dep. at 43:11-18; Callis Decl., ¶ 8).

- Oversee certain vendors and contractors, including supervising the bid process and ensuring contract compliance and vendor/contractor performance (Davis Dep. at 59:4-11, 60:1-7, 61:1-9 & Ex. 1; Callis Decl., ¶ 7).

- Ensure any repair work at Women's Hospital was in compliance with federal, state and local requirements as well as the standards of the Joint Commission, the accreditation body for health care facilities. (Davis Dep. at 63:19-64:4, 71:7-20 & Ex. 1).

In mid to late 2015, shortly after Medxcel took over facility operations at Women's Hospital, Medxcel analyzed its Facilities Supervisor position and determined the position should be re-classified from an hourly position to an exempt, salaried position. (Gordon Dep. at 102:11-13; Waller Decl., ¶ 6). Medxcel based its decision on the Facilities Supervisor job responsibilities and earnings. (Breeze Dep. at 42:1-5; Waller Decl., ¶ 6). Effective on or around November 4, 2015, Medxcel reclassified Davis and other Facilities Supervisors from hourly, non-exempt employees to salaried, exempt employees. (Davis Dep. at 85:16-18, 88:3-9 & Exs. 2 & 3; Waller Decl., ¶ 7).

4

After becoming a salaried employee, Davis did not track his hours in any way to show how many hours he worked per week. (Davis Dep. at 90:8-14). He never filed a wage claim with the Indiana Department of Labor, and he never raised any internal complaints about the transition to salary. (Davis Dep. at 89:9-10, 90:18-20). Davis's annual base salary in 2016 was $64,084.80, or approximately $1,232.40 per week.  (Davis Dep. at 83:20-84:1 & Ex. 2).

B.     **Davis's Repeated Performance Problems.**

Immediately after becoming an employee of Medxcel, Davis was the highest level employee working in the Facilities Department at Women's Hospital. (Waller Decl. ¶ 8). Davis did not perform well without a Facilities Manager overseeing his daily operations. (*Id*. at ¶ 9). Medxcel leadership received multiple complaints about maintenance deficiencies at Women's Hospital in early 2015. (*Id*.).

As a result of these complaints and general observations of the operations at Women's Hospital, Regional Director Eric Waller ("Waller') assigned Facilities Manager Jason Callis ("Callis") to manage Davis and Women's Hospital in or around March or April 2015. (Davis Dep. at 24:2-19; Waller Decl., ¶ 10, Callis Decl., ¶ 5). Previously, Callis managed Medxcel's 86th Street Hospital location only, but Waller added the Women's Hospital to Callis's area of responsibility in an effort to help Davis improve. (Davis Dep. at 24:11-19; Waller Decl., ¶ 10; Callis Decl., ¶¶ 4-5). Callis reported to Mitchell Breeze ("Breeze"), Director of Facilities, who was also based out of the 86th Street main campus. (Davis Dep. at 25:3-20; Breeze Dep. at 5:4-7).

Soon after Callis became Facilities Manager over Women's Hospital, Callis began to develop his own concerns about Davis's job performance. (Callis Decl., ¶ 9). Callis quickly observed Davis had problems with time-management, critical thinking, and prioritization. (*Id*.) Specifically, Davis failed to properly manage the work order list for repairs. (*Id*.). Additionally,

hospital staff routinely had to make multiple requests for the same repair and could go weeks or even months without assistance. (*Id.*). Hospital staff also observed a "lack of follow-through on projects" and complained to Medxcel about lack of communication on Davis's part. (Deposition of Jill Lancaster ("Lancaster Dep.") at 3:13-19, 11:13-25). Callis also observed Davis's office was in disarray and frequently unorganized. (Callis Decl., ¶ 10). This was a major concern, as Davis was responsible for maintaining necessary paperwork to meet compliance standards. (*Id.*). Callis met with Davis weekly and often spoke to him daily regarding these concerns in an effort to improve his performance. (Davis Dep. at Exs. 5 & 6; Callis Decl., ¶ 11; Matthews Decl., ¶ 6).

Facilities Technician Dan Lovelace also observed "Davis had a problem with procrastination, and work orders remained open for long periods of time." (Lovelace Decl., ¶ 9). Lovelace further recalls that Davis was difficult to communicate with and could be rude and unprofessional to hospital staff.  Indeed, staff at Women's Hospital complained to Lovelace on more than one occasion that Davis was rude or dismissive. (*Id.* at ¶ 8).

Davis's poor job performance led to serious safety concerns. In May 2015, a water main break occurred at Women's Hospital. (Davis Dep. at 102:4-103:8 & Ex. 5; Callis Decl., ¶ 12; Lovelace Decl., ¶ 7). At the time, several managers, including Callis, were out of town at a conference. (Davis Dep. at 102:4-103:8; Callis Decl., ¶ 12; Waller Decl., ¶ 11). Davis observed water bubbling up outside of the building toward the end of his shift one evening. (Davis Dep. at 102:4-103:8; Callis Decl., ¶ 12; Waller Decl., ¶ 11; Lovelace Decl., ¶ 7). Rather than addressing the issue or raising it with his supervisors, Davis went home for the day. (Davis Dep. at 102:4-103:8; Callis Decl., ¶ 12; Waller Decl., ¶ 11; Lovelace Decl., ¶ 7). The following day, Medxcel discovered the water main had broken. (Davis Dep. at 102:4-103:8; Callis Decl., ¶ 12; Waller Decl., ¶ 11). Several managers, including Callis, immediately left the conference to return to

Indianapolis to join Regional Director Waller in addressing the emergent issue. (Callis Decl., ¶ 13; Waller Decl., ¶ 12). The hospital was forced to divert Operating Room ("OR") operations for a day while the break could be repaired, causing severe issues. (Callis Decl., ¶ 13; Waller Decl., ¶ 12). Callis counseled Davis this conduct was unacceptable. (Davis Dep. at 103:3-13 & Ex. 5). Had Davis addressed the issue the night before, the main could have been fixed overnight and the impact of the break would have been significantly lessened. (Lovelace Decl., ¶ 7). Davis acknowledged he should have made different decisions to avoid such a major crisis. (Callis Decl., ¶ 13; Waller Decl., ¶ 12). He pledged to do better moving forward. (Callis Decl., ¶ 13; Waller Decl., ¶ 12).

Despite Davis's pledge to improve his performance, in particular by keeping managers informed of potentially serious maintenance issues, in approximately November 2015, an ongoing problem emerged with an air-handling unit at Women's Hospital's Neonatal Intensive Care Unit ("NICU"). (Davis Dep. at 103:14-104:1; Callis Decl., ¶ 15). Davis had been aware of a problem with the unit, but failed to escalate the problem to Callis or to any other manager for their input. (Davis Dep. at 103:14-104:1; Callis Decl., ¶ 15). Eventually the unit broke, and the NICU was forced to rely on only one unit while the broken unit was being fixed. This was particularly concerning because infants in the NICU frequently are unable to regulate their body temperatures, and temperature control is critical to their safety. (Callis Decl., ¶¶ 15-16). Callis again counseled Davis that his conduct was unacceptable.  (Davis Dep. at 103:14-104:22 & Ex. 5).

### C.   Davis's Disrespectful Communications with Coworkers and Clients.

Despite Callis's repeated counseling, Davis did not show consistent improvement. (Callis Decl., ¶ 19-21; Waller Decl., ¶ 13). For example, in late 2015, Callis observed Davis communicating rudely with his co-workers via email on more than one occasion. (Callis Decl. ¶

7

21). Consequently, Callis worked with Senior Human Resources ("HR") Business Partner Zach Matthews ("Matthews") to deliver a Second Written Warning to Davis on or around December 7, 2015 regarding his inappropriate and unprofessional business communications. (Davis Dep. at 94:19-95:6 & Ex. 5; Callis Decl., ¶ 22 & Ex. A; Matthews Decl., ¶ 6 & Ex. A).[3] Callis attached several emails to the warning, demonstrating Davis's inappropriate communication style. (Davis Dep., Ex. 5). The December 7 warning specifically noted Davis's earlier verbal counseling regarding the water main and air handling unit incidents. (*Id*.)

### D.    March 30, 2016 Performance Development Plan.

Throughout the remainder of 2015 and into 2016, Callis continued to have frequent conversations and counseling sessions with Davis related to Davis's poor performance. (Callis Decl., ¶ 23; Matthews Decl., ¶ 7; Waller Decl., ¶ 13). In or around March 2016, Waller received an email from Erica Wehrmeister, Chief Operating Officer with responsibility for Women's Hospital, complaining about the conditions at Women's Hospital. (Waller Decl., ¶ 14; Callis Decl., ¶ 24; Davis Dep. at 106:14-17). Among other things, Wehrmeister relayed concerns about stained ceiling tiles which implicated significant air quality concerns. (Callis Decl., ¶ 24). As a result of Wehrmeister's complaint, Waller reviewed work orders for Women's Hospital and learned there were open work orders more than twenty-eight (28) days old, and several were months old. (Waller Decl., ¶ 14).

On or around March 30, 2016, Waller and Callis toured Women's Hospital with Davis to examine the areas of concern Wehrmeister and other clients had raised during Davis's tenure as Facilities Supervisor. (*Id*. at ¶ 15; Callis Decl., ¶ 25). During their inspection, Callis and Waller

---

[3] Davis testified he did not receive the December 7, 2015 written warning until March 2016. (Davis Dep. at 94:19-96:2 & Ex. 5). Davis admits receiving the warning, however. (*Id*. at 95:19-96:3). Indeed, he signed the disciplinary warning and dated it December 8, 2015. (Davis Dep. at 94:19-95:10 & Ex. 5).

observed several deficiencies, including the need to replace ceiling tiles, which was indeed a serious air quality issue. (Waller Decl., ¶ 15; Callis Decl., ¶ 25). They also observed other facilities and maintenance concerns, such as damage to doors, deficiencies with regard to signage, and other general maintenance shortcomings. Davis's office was also in disarray and unorganized. (Waller Decl., ¶ 15; Callis Decl., ¶ 25; Davis Dep. at 106:18-107:4).

In a meeting immediately following the inspection on March 30, 2016, with both Waller and Davis in attendance, Callis delivered a 60-day Performance Development Plan ("PDP") to Davis. (Davis Dep. at 93:21-94:2, 125:12-24 & Ex. 6; Callis Decl., ¶ 26 & Ex. B; Waller Decl., ¶ 16 & Ex. A). Prior to delivery, Matthews assisted Callis in preparing the PDP, and Waller reviewed the PDP. (Callis Decl., ¶ 26 & Ex. B; Waller Decl., ¶ 16 & Ex. A; Matthews Decl., ¶ 8 & Ex. B). Matthews and Callis drafted the PDP to specifically outline Davis's challenges, with examples to help Davis understand where his deficiencies lay and what was expected of him in terms of improvement. (Callis Decl., ¶ 27; Matthews Decl., ¶ 8 & Ex. B). The PDP outlined issues with Davis's performance, including: (1) failure to escalate issues appropriately; (2) challenges with driving productivity, communication and accountability with his team; (3) outbursts with customers and other inappropriate and aggressive communication; and (4) failure to meet Environment of Care ("EOC") quality expectations, including effective management of work orders and daily monitoring to ensure all records are up to date and meeting compliance standards.  (Davis Dep. at Ex. 6; Callis Decl., ¶ 27 & Ex. B; Matthews Decl., ¶ 8 & Ex. B).

At the March 30, 2016 meeting, Callis informed Davis if his performance did not improve, his employment would be terminated. (Davis Dep. at 97:11-19, 105:1-107:4; Callis Decl., ¶ 28; Waller Decl., ¶ 18). During the meeting, Davis became very aggressive and defensive. (Waller Decl., ¶ 18; Callis Decl., ¶ 28). As a result, Waller advised Davis to take a day

off to consider his response to the PDP and his willingness to work to improve his performance. (Davis Dep. at 108:13-22; Waller Decl., ¶ 18; Callis Decl., ¶ 28). At no point during the March 30 meeting did Davis report any alleged discrimination. (Callis Decl., ¶ 30; Waller Decl., ¶ 20; Davis Dep. at 28:15-22).

Within days of receiving the PDP, Davis attended a follow-up meeting with Waller, Callis, and Matthews. (Waller Decl., ¶ 19; Callis Decl., ¶ 29; Matthews Decl., ¶ 9; Davis Dep. at 108:24-109:12). During the meeting, Davis responded to the PDP and created an action plan for the areas in which he understood he needed to improve. (Davis Dep. at 123:18-124:5 & Ex. 6 (column 4); Waller Decl., ¶ 19 & Ex. A; Callis Decl., ¶ 29 & Ex. A; Matthews Decl., ¶ 9 & Ex. B). In his action plan, Davis stated he would, *inter alia*, "continue to escalate facility emergent situations to manager . . . .," "will work diligent[ly] to control stress levels," "reach out to HR for education/training/resources that could assist/mentor him in communication," and "identify needed repairs and service around the building." (Davis Dep. at Ex. 6).

At no time during this follow-up meeting did Davis ever raise a concern he was being discriminated against based on his age, his medical condition, or for any other reason. (Waller Decl., ¶ 20; Callis Decl., ¶ 30; Matthews Decl., ¶ 10; Davis Dep. at 28:15-22). Instead, he responded he knew what he should be doing and would do it moving forward. (Davis Dep. at 109:13-110:2, 123:18-124:5 & Ex. 6). Davis acknowledges none of the treatment he experienced while Callis supervised him was discriminatory. (Davis Dep. at 28:15-22).

### E.    Davis's Continued Poor Performance Under New Manager Kenneth Gordon

In May 2016, Medxcel restructured its Facilities Managers in order to balance out workload. (Waller Decl., ¶ 22). In order to more evenly distribute responsibilities, Kenneth Gordon ("Gordon") took over management responsibilities at Women's Hospital, as well as the Seton Specialty campus ("Seton"), which was smaller than the 86th Street Hospital campus,

which Callis managed. (*Id.*). As such, Gordon became Davis's manager in May 2016. (Davis Dep. at 26:1-9, 125:8-11 & Ex. 22; Breeze Dep. at 12:4-25; Gordon Dep. at 5:2-9, 29:10-15; Waller Decl., ¶ 22; Matthews Decl., ¶ 11). Gordon was primarily located at Seton, but he visited Women's Hospital at least once a day. (Davis Dep. at 128:7-11, 147:15-18).[4]

During the manager transition, Callis and Matthews talked with Gordon about Davis's PDP and general performance, including his strengths and weaknesses. (Matthews Decl., ¶ 12; Callis Decl., ¶ 33; Gordon Dep. at 34:24-37:24, 39:17-40:4). When Gordon spoke with Matthews, Matthews agreed with Gordon that the PDP should be kept in place to continue to provide Davis an opportunity to improve, at least for some period of time. (Matthews Decl., ¶ 12; Callis Decl., ¶ 33; Gordon Dep. at 39:17-40:4). However, Matthews also recommended, due to continued serious performance deficiencies, Davis should be terminated if he did not improve significantly in a short period of time. (Matthews Decl., ¶ 12; Callis Decl., ¶ 33). Matthews and Callis communicated those concerns to Davis. (Callis Decl., ¶ 33).

Gordon met with Davis after he became Facilities Manager at Women's Hospital. (Davis Dep. at 131:11-133:3; Gordon Dep. at 44:3-13). They discussed the ongoing PDP, and Gordon explained his expectations regarding Davis's performance. (Davis Dep. at 131:11-133:3; Gordon Dep. at 82:18-83:2, 83:19-24). Gordon specifically stated his expectation that Davis meet his job duties related to EOC Rounding by conducting rounds on a weekly basis. (Davis Dep. at 134:12-135:18; Breeze Dep. at 37:12-39:3; Gordon Dep. at 120:18-121:16).[5] Davis now claims that

---

[4] Gordon regularly greets people by saying "O" followed by the person's name. (Gordon Dep. 118:17-119:12; Dkt. # 1, ¶¶ 20, 21, 31; Davis Dep. at 172:4-173:4).

[5] During EOC Rounding, Davis and his staff were supposed to circulate through the hospital and routinely check the entire hospital for outstanding maintenance issues. (Davis Dep. at 134:12-135:16; Gordon Dep. at 120:18-121:16; Callis Decl., ¶ 17). Rounding could easily be accomplished while completing other tasks. (Gordon Dep. at 120:18-121:16; Callis Decl., ¶ 17).

during this first meeting, in response to Davis's protests that he could not complete rounding, Gordon allegedly stated, "I don't need this pushback from you. I've got younger guys at Seton." (Davis Dep. at 143:9-12).[6]

Gordon began to receive complaints from hospital staff regarding Davis's failure to complete work orders or to fix problems correctly, as well as continued discourteous communication with hospital staff. (Gordon Dep. at 68:10-21, 69:3-13, 100:10-22). For example, Gordon received a complaint from a food and nutrition manager regarding a faulty cooler. (Gordon Dep. at 68:10-21). The manager complained Davis was "really short" with the kitchen staff, who contacted him after the cooler continued to malfunction. (*Id.*). Gordon expressed concern to Davis about another complaint he received from a hospital manager regarding a request to Davis's team to paint certain offices. (Davis Dep. at 184:8-185:18). The manager asked Davis about the painting project, and Davis replied, "Don't hold your breath." (Gordon Dep. at 100:17-22). Gordon also received a call from an outside vendor who reported Davis threatened him. (Davis Dep. at 189:15-191:17).

**F.    Davis Never Asked Medxcel for An Accommodation for Any Medical Condition**

Davis has been diagnosed with congestive heart failure and underwent open heart surgery in 1998. (Davis Dep. at 158:9-17, 159:16-19). Between 2008 and 2016, Davis underwent further medical procedures to insert a pacemaker and stents. (Davis Dep. at 160:1-161:3). However,

---

If Davis did his job correctly, weekly rounding should have been relatively easy. (Gordon Dep. at 120:18-121:16; Callis Decl., ¶ 17). However, despite being repeatedly counseled to complete this task, Davis continually failed to complete weekly rounding to ensure hospital maintenance issues were being addressed in a prompt and satisfactory manner. (*Id.*) Callis specifically directed Davis to complete EOC rounding in the March 2016 PDP. (Davis Dep. at Ex. 6). Davis's failure to complete EOC rounding continued until the time of Davis's termination. (Breeze Dep. at 37:12-39:3; Gordon Dep. at 99:12-100:12; Davis Dep. at 135:14-136:18).

[6] Gordon vehemently denies making this statement. (Gordon Dep. 122:9-11).

Davis never filed any paperwork with Medxcel identifying his medical condition. (Davis Dep. at 163:17-20). Davis did not take medical leave when he underwent a stent procedure in June 2016. (Davis Dep. at 165:8-19). Rather, he took one day of paid time off. (Davis Dep. at 165:8-19). During Davis's entire employment with Medxcel, he never requested medical leave. (Davis Dep. at 167:2-8).

Nevertheless, Davis's Medxcel supervisors took Davis at his word about a lifting restriction and made informal accommodations to meet the alleged restriction. (Callis Decl., ¶ 35). Davis never asked for an accommodation related to stress, and he did not raise stress as a concern in connection with a medical condition. (Matthews Decl., ¶ 22; Callis Decl., ¶ 34). On multiple occasions, including in the PDP, Callis, Gordon, and Matthews discussed with Davis strategies for managing his stress in order to improve his job performance and communication with his co-workers and hospital staff. (Davis Dep. at Exs. 6, 8 & 10; Matthews Decl., ¶ 22). Those discussions related to Davis's performance, including his unprofessional communications, and not any medical condition. (*Id*).

### G.    Davis's Request to Step Down from Supervisor Role.

On June 20, 2016, just days after Gordon sent Davis an email detailing his expectations of Davis in his supervisory role, Davis asked Gordon if it would be possible to step down from the supervisor role. (Davis Dep. at 176:11-19 & Exs. 8 & 24; Gordon Dep. at Ex. 23). Gordon and Breeze met with Davis on June 22, 2016 to discuss Davis's request to step down. (*Id.* at 179:10-15 & Ex. 8; Breeze Dep. at 30:4-31:11). Following the meeting, Breeze and Gordon analyzed Davis's skill set and considered moving him to another position. (Breeze Dep. at 30:4-31:11, 33:1-9 & Ex. 32; Gordon Dep. at 58:1-7).

In an email from Gordon to Breeze on June 23, 2016 discussing Gordon's subordinates at Women's Hospital and Seton as well as a potential restructuring of the facilities department,

Gordon evaluated each employee's "Strengths, Pros" and "Weaknesses, cons, concerns." (Gordon Dep. 63:16-25 & at Ex. 25). Gordon listed Davis's weaknesses as "unorganized, health concerns and restrictions, doesn't handle stress well, time management skills, difficulty with paper work, communication." (*Id.*). Gordon mentioned Davis's "heath concerns and restrictions" because he was concerned about his ability to accommodate Davis's informal lifting restriction in another position, where more lifting might occur. (Gordon Dep. at 63:10-63:22 & Ex. 25). On or around July 5, 2016, before Breeze and Gordon could make a final decision about transferring Davis to a plumber position, Davis returned to Gordon and stated that he changed his mind and wanted to stay in the supervisor role "and do what it takes to be successful." (Davis Dep. at 178:3-16, 180:3-7 & Ex. 8; Breeze Dep. at 33:1-14).

### H.    July 2016 Annual Performance Review and Final Warning.

In early July 2016, Gordon worked with Matthews to prepare Davis's annual performance review. (Davis Dep. at 205:4-12 & Ex. 9; Matthews Decl., ¶ 14 & Ex. C; Gordon Dep. at 81:24-82:10). Gordon and Matthews gave Davis an overall rating of 2.17 out of 5, a low score, indicating significant coaching was needed. (Davis Dep. at Ex. 9; Matthews Decl., ¶ 14). The annual performance review noted, among other concerns, that "[r]eview of work orders showed past due dating back 6 months." (Davis Dep. at Ex. 9). Further, despite the March 2016 PDP and prior discipline, "the same issue[s] go unresolved time after time." (*Id.*). Davis never complained to Gordon or to anyone in management or Human Resources that this annual performance review was discriminatory. (Davis Dep. at 206:10-207:2).

Gordon and Matthews also prepared a "Coaching for Improvement/Final Warning" in early July 2016 related to Davis's work performance. (Gordon Dep. at 89:19-22, 91:1-7; Davis Dep. at 175:2-15 & Ex. 8; Matthews Decl., ¶ 15 & Ex. D). The Final Warning set forth concerns about Davis's past and continued performance deficiencies, and outlined expectations going

forward. (Davis Dep. at Ex. 8). Most of those expectations were continuations of expectations set forth in the March 2016 PDP, including the expectation that Davis would "perform all duties of a supervisor." (Davis Dep. at 197:22-198:1 & Ex. 8). The Final Warning provided:

- There has [sic] been previous Performance Development Plans, warnings and write ups for Paul in the past for behavior, lack of performance and duties as supervisor.
- Paul's past performance as supervisor has had a negative impact on work orders and documentation need[ed] for TJC, State Board Health, FMOS. This action sets Women's Hospital up for a negative inspection during surveys.
- Paul's management of stress levels with leadership, vendors and bedside staff has had a negative impact on building a good customer relationship.

(Davis Dep. at Ex. 8). The Final Warning set forth twenty (20) expectations for improvement, which included, *inter alia*, better communication with hospital employees, better management of stress, better management of staff and better management of preventive maintenance at the hospital. (*Id.*).

Gordon and Matthews delivered the annual review and Final Warning to Davis on July 7, 2016. (Matthews Decl., ¶ 15). During this meeting, Gordon stated to Davis, "I know that you talked about retiring, but we really want to – I really want you to stay here until you're in your 80s."  (Davis Dep. at 207:15-18; Gordon Dep. at 117:10-17). Davis signed the Final Warning, acknowledging "failure to correct any performance issues noted above may result in further disciplinary action, up to and including termination of employment." (*Id.* at 175:2-9 & Ex. 8). Davis acknowledged he failed to meet many of the expectations set forth in the Final Warning. (Davis Dep. at 193:1-11; 194:22-195:14, 199:5-13, 201:19-202:2). Davis never complained to Gordon, Breeze, or anyone in management or Human Resources that the Final Warning or annual review were discriminatory. (Davis Dep. at 204:19-24).

15

I.      **Davis's Continued Poor Performance after Negative Annual Performance Review and Termination from Employment.**

After July 7, 2016, Davis's supervisors received two validated complaints from Women's Hospital employees regarding inappropriate and rude comments made by Davis to hospital staff during the same two-week period. (Matthews Decl., ¶ 16). First, Davis told Jill Lancaster, Manager of Perinatal Services, Lactation and Bereavement at Women's Hospital, to "take a chill pill" during a facilities sewer leak. (Lancaster Dep. at 13:4-15:6; Gordon Dep. at 69:5-13). During the leak, a sewer pipe burst in the ceiling of Lancaster's office, and dark liquid poured directly onto an employee's head. (Lancaster Dep. at 13:4-15:6). Lancaster was concerned the associate might have been exposed to potentially infectious waste matter; she repeatedly asked Davis what type of water was in the pipe, so she could report the information to the associate health department. (Lancaster Dep. at 13:9-14; 14:3-13). Hours after the incident, when Lancaster again inquired about the water, Davis's told her to "take a chill pill." (Lancaster Dep. at 14:19-15:6; Gordon Dep. at 69:5-13). Lancaster did not report the incident, but other employees present when Davis made the comment reported it to Gordon. (Lancaster Dep. at 18:1-14). Lancaster and Davis had a friendly relationship, but Lancaster found Davis's comment to be "really rude in the moment of trying to deal with somebody who has potential infectious waste over their head." (Lancaster Dep. at 30:5-8). Similarly, Davis told a nurse manager the work orders she requested were not important and were not going to get done. (Matthews Decl., ¶ 16).

In addition to those two complaints, Davis failed to meet other expectations set forth in the PDP and the Final Warning, including weekly EOC Rounding. (Matthews Decl., ¶ 17; Gordon Dep. at 99:12-100:12; Davis Dep. at 135:14-136:18). Consequently, Breeze and Gordon made the decision to terminate Davis's employment, and Waller concurred. (Waller Decl., ¶¶ 21,

23; Matthews Decl., ¶ 18). Matthews provided input onto the decision and agreed with the decision. (*Id*.).

On July 27, 2016, Gordon and Breeze met with Davis to notify him of his termination. (Davis Dep. at 208:23-209:25 & Exs. 10 & 11; Gordon Dep. at 99:12-25). Gordon provided Davis with a copy of the "Employment Termination Request," which specified five performance issues which led to the termination, including:

- EOC rounds incomplete per development plan.
- Incomplete inspections of construction areas.
- Discourtesy and negative conversations with hospital leadership during building and maintenance concerns and issues.
- Negative conversations with hospital staff and management over information gathered for work orders within hospital.
- Negative conversation, reactions and unable to maintain stress levels with faculties manager pertaining to supervisor job expectations and performance plan.

(*Id*. at Ex. 10). The notice outlined "Multiple Verbal Coachings 3/2015 to present; PDP 3/30/16 and reiterated 7/7/16," as well as all three steps in the "Coaching and Discipline Process," including "Coaching for Performance Development, Coaching for Performance Improvement – First Warning, and Coaching for Performance Improvement – Second Warning. (*Id*.). During the meeting, Davis stated he disagreed with the termination, but did not claim his termination was a result of discrimination. (Davis Dep. at 210:4-21, 211:16-18). After Davis's termination, staff reported work orders began to be completed in a more timely manner. (Lancaster Dep. at 25:2-26:22; Lovelace Decl., ¶ 9).

> **J.      Davis Never Complained of Discrimination During his Employment.**

While he was employed with Medxcel, Davis did not report to Matthews or anyone else any concern that he was discriminated against based on his age, disability, or medical condition. (Davis Dep. at 108:24-109:12; Matthews Decl., ¶ 20). Davis called Matthews two days after he

was terminated and, for the first time, alleged discrimination based on age. (Matthews Decl., ¶ 21). Davis never reported discrimination based on any medical condition. (*Id*. at ¶¶ 20-21).

### K.     Medxcel did not Replace Davis.

Medxcel did not replace Davis, instead distributing his job duties among existing employees. (Breeze Dep. at 26:3-27:3; Gordon Dep. at 34:3-7, 101:10-22; Lovelace Decl., ¶ 15; Waller Decl., ¶ 24). Medxcel does not employ a Facilities Supervisor at Women's Hospital. (Waller Decl., ¶ 24).

### III.    ARGUMENT[7]

Medxcel treated Davis equitably and without regard to his age or any alleged disability, both during his employment and at the time of his termination. Medxcel terminated Davis's employment after repeatedly counseling him for performance deficiencies over the course of 18 months without observing any meaningful improvement. Further, Medxcel properly paid Davis all wages due. Davis's claims of discrimination and wage payment violation have no merit and should be dismissed as a matter of law.

### A.     *Davis's Age Discrimination Claim Fails Because He Has Not Offered Any Evidence his Age was the Motivating Factor of His Termination.*

In Count I of his Complaint, Davis claims Medxcel "discriminated against [him] on the basis of age by terminating his employment because of his age." (Dkt. #1, ¶ 44). Davis can avoid summary judgment on his age discrimination claim only if he "produce[s] evidence from which a jury could infer that [his] age 'was a but-for cause of his termination.'" *Ripberger v. Corizon,*

---

[7] The Federal Rule of Civil Procedure 56(c)(a) standards for granting summary judgment are well established in the Seventh Circuit and well-known to this Court. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). The Court must "construe all inferences in the non-movant's party's favor, but [Plaintiff] is not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014)).

*Inc.*, 773 F.3d 871, 880 (7th Cir. 2014) (citing *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

A plaintiff may prove age discrimination in various ways, without "separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards.'" *David v. Bd. of Trustees of Cmty. College Dist. No. 508,* 846 F.3d 216, 224 (7th Cir. 2017) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)); *Carson v. Lake County,* 865 F.3d 526, 532-33 (7th Cir. 2017) (citing *Ortiz*). A plaintiff *may* proceed by introducing direct or circumstantial evidence that his employer took an adverse action against him because of his age. *Carson*, 865 F.3d at 532-33. Alternatively, a plaintiff may proceed through the burden-shifting framework adapted from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id*. at 533. In any event, the overall test "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765; *see also David,* 846 F.3d at 224 (discussing *Ortiz*). Under either path, Davis must offer evidence such that a reasonable juror could conclude he would have kept his job but for his age. *Ortiz*, 834 F.3d at 764.

    1.    <u>Davis Cannot Establish Age Discrimination Via Direct Or Circumstantial Evidence.</u>

Initially, Davis has not and cannot point to any direct or circumstantial evidence of age discrimination. *See Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 691 (7th Cir. 2014). Direct evidence "requires an admission of discriminatory intent, *i.e.* 'smoking gun' evidence.'" (internal citations omitted).[8] Circumstantial evidence, by contrast, "must point directly to a discriminatory

---

[8] Medxcel obviously denies it discriminated against Davis on the basis of his age. (Dkt. # 11, ¶¶ 43-48).

reason for the employer's action . . . and be directly related to the employment decision." *Id.* at 691 (internal citations and quotations omitted). In support of his age discrimination claim, Davis's evidence consists of his own testimony that Gordon (1) asked Davis when he planned to retire; (2) stated he employed "younger guys at Seton";[9] and (3) "made a habit of greeting Davis in a sarcastic way as 'O' Paul Davis.'" (Dkt. # 1, ¶¶ 20, 21, 31; Davis Dep. at 172:4-173:4). These comments do not provide direct or circumstantial evidence of age discrimination.

First, while Gordon did inquire about when Davis intended to retire, Davis testified Gordon later said, "I know that you talked about retiring, but we really want to – I really want you to stay here until you're in your 80s." (Davis Dep. at 207:15-18; Gordon Dep. at 117:10-17). This admission undermines Davis's contention that Gordon wanted him to retire due to his age, and defeats any contention Gordon harbored animosity toward older workers generally, or toward Davis specifically. Further, even if Gordon had suggested Davis should retire, "'suggestion[s] of retirement do[] not rise to the level of direct evidence of age discrimination' when there is an alternative explanation for the employment action." *Fleishman*, 698 F.3d at 606 (quoting *Kaniff v. Allstate Ins. Co.*, 121 F.3d 258, 263 (7th Cir. 1997) (holding that retirement offered as alternative to termination for improper conduct not proof of age discrimination); *Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 714-15 (7th Cir. 1999) (holding that question asking, "What would you think if we gave you early retirement, with some extra compensation because of your age?" offered as an alternative to laying off plaintiff did not create inference of discrimination); *Darnell v. Dayton Hudson Corp.*, 808 F. Supp. 1370, 1373 n.3 (S.D. Ind. 1992) ("An employer does not violate the ADEA by asking if an employee is considering retirement." (citing *Henn v. National Geographic Soc'y,* 819 F.2d 824, 826 (7th Cir.), *cert. denied,* 484 U.S. 964 (1987)).

---

[9] Again, Gordon denies making this comment. (Gordon Dep. 122:9-11).

Gordon told Davis he wanted him to remain employed rather than retiring; even if he had suggested retirement, such a comment is not sufficient support for Davis's age discrimination claim.

Further, with regard to Gordon's alleged comment about employing "younger guys" at Seton, "stray remarks disconnected from the decision to terminate [Davis] . . . do not constitute an admission that he was fired because of his age" and therefore cannot constitute direct or circumstantial evidence of age discrimination. *See Schaffner v. Glencoe Park Dist.*, 256 F.3d 616, 622-23 (finding that remarks that plaintiff "shows lack of enthusiasm for job," that he was "not very energetic" and seemed "very settled in job and sometimes unwilling to continue growing with the program" were <u>not</u> age-related and were "best described as stray remarks, unrelated to the employment decision in question and thus insufficient to support an inference of pretext"), citing *Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096, 1099 (7th Cir. 2001); *see also Nelson v. UPS, Inc.*, 337 F. App'x 561, 563 (7th Cir. 2009) (holding that managers comments that plaintiff "was too old and too slow, as well as repeated references to him as 'Old Silver,'" did not constitute direct evidence of age discrimination)).

Likewise, the allegation that Gordon called Davis "O' Paul Davis" does not bolster Davis's age discrimination claim. First, there is no evidence that "O" refers to "old" or is related to Davis's age in any way. Davis does not allege the Gordon called him "Old" Paul Davis. Second, Gordon addressed everyone in this manner, regardless of age. (Gordon Dep. at 118:14-119:12; Lovelace Decl., ¶ 14). Like the use of "Old Silver" in *Nelson*, Gordon's colloquial use of "O" before Davis's name does not demonstrate age-related animus, and simply cannot support an age discrimination claim. Davis's own conduct also undermines his claim that he took Gordon's comments seriously, as he never reported any alleged comments to a member of management or

Human Resources and never complained while working at Medxcel that he was being discriminated against because of his age or any other protected status. (Davis Dep. at 28:15-22, 108:24-109:12, 204:19-24, 206:10-207:2, 211:16-18).[10] Thus, Gordon's alleged isolated comments are simply not the stuff of which age discrimination claims are made.

Davis's proposed evidence of age discrimination also fails because the comments were not contemporaneous with Medxcel's decision to terminate him. "[I]solated comments are not probative of discrimination unless they are 'contemporaneous with the discharge or causally related to the discharge decision-making process.'" *Fleishman*, 698 F.3d at 605) (internal citations and quotations omitted); *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002) (comments made two months before termination decision were not contemporaneous to adverse action); *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 854-55 (7th Cir. 2015) (citing *Markel*). Even if Gordon made the alleged comments, they occurred several months before Davis's termination and cannot support Davis's claim of age bias.

Finally, Medxcel representatives did not suddenly begin criticizing Davis's performance at the same time Gordon allegedly made the above statements. The evidence demonstrates that Callis, Waller and Matthews had been counseling Davis regarding his leadership and communication styles for over a year before Gordon became Davis's supervisor. (Davis Dep. at Exs. 5 & 6; Callis Decl., ¶¶ 9-32; Waller Decl., ¶¶ 9-21; Matthews Decl., ¶¶ 6-10).[11] Davis himself admits nothing Callis did was discriminatory. (Davis Dep. at 28:15-22). Davis was well

---

[10] Further, Davis's subordinate, Dan Lovelace, who is 60, never heard Gordon make any statement referencing "young workers" or any other statement that could be construed as discrimination based on age. (Lovelace Decl., ¶ 13).

[11] Indeed, Davis himself testified that, in the meeting on March 30, 2016, immediately after the inspection of Women's Hospital, Waller stated, "I have seen enough . . . I should fire you right here and now." (Davis Dep. at 106:18-107:4).

down the disciplinary road before Gordon took over. Thus, Davis cannot show that Gordon's alleged comments constitute direct or circumstantial evidence of age discrimination.

2.   Davis Cannot Establish a *Prima Facie* Case of Age Discrimination and Cannot Prove Pretext.

Likewise, Davis cannot prove age discrimination under the *McDonnell Douglas* framework. In order to prove age discrimination in his termination under *McDonnell Douglas*, Davis must come forward with evidence showing that (1) he was in the protected age group; (2) he was performing his job satisfactorily or was qualified for the job for which he applied; (3) he was discharged, not hired, not promoted, etc.; and (4) younger employees were treated more favorably. *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir. 1995). The burden of production then shifts to Medxcel to articulate a legitimate non-discriminatory reason for discharging Davis. *Id.* at 780; *Denisi v. Dominick's Finer Foods, Inc.,* 99 F.3d 860, 864 (7th Cir. 1996). If Medxcel meets its burden of production, the burden shifts back to the plaintiff to prove that the employer's proffered explanation is merely a pretext for age discrimination. *Taylor*, 69 F.3d at 779. "At all times, however, the plaintiff retains the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against him based upon his age." *Id.* (citing *St. Mary's Honor Ctr. v. Hick*, 509 U.S. 502, 511 (1993).

Davis cannot meet the elements of his *prima facie* case of age discrimination. First, Davis cannot show that he was performing his job satisfactorily or meeting his employer's legitimate employment expectations. Specifically, Davis failed to meet his job expectations as shown in the PDP and his Second and Final Warning which reiterated the PDP. *Anderson v. Jewel Food Stores, Inc.*, 837 F. Supp. 2d 826, 833 (N.D. Ill. 2011) (Plaintiff "has not presented evidence raising a genuine dispute as to any material fact that she was meeting Jewel's legitimate job expectations because she violated the food handling and coding policies in May 2008.").

Second, Plaintiff cannot show that any similarly situated employee received more favorable treatment. Davis has not identified any similarly situated employees who were treated more favorably, and Medxcel is not aware of any employees with similar performance issues who were retained. Further, Medxcel did not replace Davis, instead distributing his job duties among existing employees. (Breeze Dep. at 26:3-27:3; Gordon Dep. at 34:3-7, 101:10-22; Lovelace Decl., ¶ 15). Thus, Davis cannot establish a *prima facie* case of age discrimination.

Even if Davis were able to meet the elements of his *prima facie* case, Medxcel had a legitimate, nondiscriminatory reason for terminating Davis – continued performance issues despite Davis's prior coaching/discipline and PDP. Davis simply could not meet Medxcel's performance expectations for a Facilities Supervisor. As set forth in detail above, Medxcel supervisors received multiple complaints about maintenance deficiencies at Women's Hospital for which Davis was responsible, as well as repeated complaints about Davis's rude communications with Hospital staff. Despite repeated warnings, these deficiencies continued until Davis's termination.

Davis cannot prove, as is his burden, that Medxcel's proffered reason for his termination is pretextual for intentional age discrimination. *See Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014) (citing *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006)). Specifically, Davis has failed to present evidence that "but for" his age, Medxcel would not have taken any adverse action against him. *Fleishman*, 698 F.3d at 603-04. Indeed, as set forth above, the only evidence Davis offers in support of his age claim are alleged stray remarks by Gordon which simply do not support an age discrimination claim. *See Fleishman*, 698 F.3d at 605. In sum, Davis has absolutely no evidence that Medxcel's stated explanation for Davis's

counselings, PIP, and termination, was anything but truthful. Davis's age discrimination claim fails at every front, and Medxcel is entitled to summary judgment on Count I of the Complaint.

    **B.**    ***Medxcel Terminated Davis's Employment Because of Significant Performance Deficiencies and Not Because of Any Alleged Disability.***

Like his age discrimination claim, Davis cannot offer sufficient evidence such that a reasonable juror could believe any disability motivated Medxcel to terminate his employment. *See Ortiz*, 834 F.3d at 765. To establish a *prima facie* case of disability discrimination, Davis must show: (1) he is disabled under the ADA; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably. *Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014). The same burden shifting analysis set forth above applies to Mr. Davis's disability discrimination claim—with Davis bearing the ultimate burden of establishing his disability caused his discharge. *Id.*; *Ortiz,* 834 F.3d at 765; *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) (applying the *Ortiz* analysis in an ADA disability discrimination case); *Riley v. City of Kokomo*, No. 1:15-cv-391-WTL-DML, 2017 WL 897281, at *7 (S.D. Ind. Mar. 7, 2017) (same); *Amadio v. Ford Motor Co.*, 238 F.3d 919, 924 (7th Cir. 2001).

Davis cannot establish a *prima facie* case of disability discrimination. First, he cannot show that he was performing his job satisfactorily or meeting his employer's legitimate employment expectations. Specifically, Davis failed to meet his job expectations as shown in the PDP and his Second and Final Warning which reiterated the PDP. *See Bunn,* 753 F.3d at 685 (holding that plaintiff failed to establish *prima facie* case because he did not meet his employer's legitimate expectations when he shoved a trash can at the night manager). Second, Davis cannot demonstrate similarly situated employees without a disability received more favorable treatment. Not only has Davis not identified any similarly situated individuals who were treated more

favorably—he affirmatively stated he does not believe anyone else without a disability was treated more favorably. (Davis Dep. at 216:21-23).

Even if Davis could establish a *prima facie* case of disability discrimination, Mexcel has articulated legitimate, nondiscriminatory reason for Davis's termination—his ongoing poor performance, described above. Davis cannot show that Medxcel's proffered legitimate, non-discriminatory reason is actually pretext for disability discrimination. First, while some (but not all)[12] of Davis's coworkers and supervisors were aware generally that he had a heart condition, he never filed any paperwork with Medxcel identifying any medical condition. (Davis Dep. at 163:17-20; Callis Decl., ¶¶ 34-35; Lovelace Decl., ¶ 12). Further, he never requested any medical leave including when he underwent a stent procedure in 2016. (Davis Dep. at 165:8-19). He also never asked for any accommodation for any medical issue, including, but not limited to, a heart condition or "stress," while working for Medxcel. (Davis Dep. at 163:17-20; Matthews Decl., ¶ 22; Callis Decl., ¶ 31). Nevertheless, Medxcel demonstrated its good faith and lack of discriminatory animus by honoring Davis's verbal request for a lifting restriction. (Callis Decl., ¶ 35). Indeed, Davis never made any complaints to any supervisor at Medxcel or to HR that he believed that he was being discriminated against based on any medical condition. (Matthews Decl., ¶ 20; Waller Decl., ¶¶ 20, 25, 27; Callis Decl., ¶ 30).

Davis's only alleged evidence in support of his disability discrimination claim is a June 23, 2016, email from Gordon to Breeze discussing Gordon's subordinates. (Gordon Dep. at Ex. 25). In the email, Gordon evaluated each employee's "Strengths, Pros" and "Weaknesses, cons, concerns." (*Id.*). With regard to Davis, Gordon testified that he was worried about Davis's informally accommodated lifting restriction in light of Davis's request to step down from a

---

[12] For example, Waller was not aware until after this lawsuit was filed that Davis had any medical condition at all. (Waller Decl., ¶ 25).

supervisor position into a plumber position and that if Davis stepped down into a technician role, it would be more likely he could violate the lifting restriction. (Gordon Dep. at 63:10-63:16). Gordon's testimony belies any discriminatory animus. Moreover, as discussed above, isolated comments, more than a month before his termination, and completely unrelated to the termination, do not alone support Davis's disability discrimination claim. *Fleishman*, 698 F.3d at 605.

Additionally, to the extent that Davis is claiming Medxcel discriminated against him as a result of some alleged medical condition related to stress, the evidence shows that Davis never sought an accommodation related to stress, and he did not mention stress to anyone as a medical condition. (Matthews Decl., ¶ 22; Callis Decl., ¶ 34). Further, the ADA does not

> shelter disabled individuals from adverse employment actions if the individual, *for reasons unrelated to his disability* (such as a poor work ethic, carelessness, bad attitude, insubordination or unprofessional demeanor) is *not qualified* for the job or is *unable to perform* the job's essential functions or fulfill the requirements of the position as prescribed by the employer or 'fails to meet his employer's expectations.'

*Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005).

The evidence demonstrates Davis's supervisors discussed with Davis ways to manage his stress in order to improve his job performance. (Davis Dep. at Exs. 6, 8 & 10; Matthews Decl., ¶ 22). Specifically, Davis grew short tempered when difficult situations arose and was unprofessional or rude in his communications with co-workers and Women's Hospital employees. (Davis Dep. at 184:8-185:18, 189:15-191:17 & Exs. 5, 6, 8; Lancaster Dep. at 14:19-15:6, 30:5-8; Gordon Dep. at 68:10-21, 69:5-13, 100:17-22; Lovelace Decl., ¶ 8; Callis Decl., ¶¶ 21-22 & Ex. A; Matthews Decl., ¶ 6, 16, 22). Callis and Gordon counseled Davis about these communications and made recommendations for dealing with the stress as it related to Davis's job performance. Their discussions did not relate to any alleged or perceived medical condition.

(Davis Dep. at Exs. 6, 8 & 10; Matthews Decl., ¶ 22). Davis simply cannot point to any evidence proving that Medxcel discriminated against him because of any stress-related medical condition.

Medxcel is entitled to summary judgment on Count II of Plaintiff's Complaint.

**C.** **Davis Cannot Succeed on His Wage Claims under the FLSA and the Indiana Wage Claims Act[13] Because He Was an Exempt Employee and Therefore Not Entitled to Overtime Compensation.**

Davis's wage claims in Counts III and IV will likewise fail. Davis was an executive employee exempt from FLSA overtime requirements and is not entitled to any alleged unpaid wages. The FLSA requires employers to pay employees overtime compensation for any hours worked in excess of 40 in a work week. 29 U.S.C. § 207(a)(1). Certain employees are exempt from the FLSA's overtime pay requirements. 29 U.S.C. § 213(a)(1). Because Davis was exempt under Section 213(a)(1), Medxcel was not required to compensate him for overtime, and his wage claims fail as a matter of law.

The FLSA provides a complete minimum wage and overtime pay exemption for "any employee employed in a bona fide executive . . . capacity." 29 U.S.C. § 213(a)(1) ("Executive Exemption"). An employee qualifies for the Executive Exemption if he satisfies the elements enumerated by 29 C.F.R. § 541.100(a), which states than an executive employee must:

1) Be compensated on a salary basis at a rate of not less than $455 per week;

2) Have the primary duty of management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

---

[13] Davis's claim under the Indiana Wage Claims Act is wholly derivative of his claim under the FLSA and fails for the same reasons that his FLSA claims, as set forth herein. Additionally, while Davis asserted in his Complaint that he exhausted his administrative remedies under the IWCA, he failed to produce evidence of that exhaustion in discovery. Specifically, in response to Medxcel's discovery request seeking information related to correspondence with any local, state or federal government agency, Davis failed to produce any correspondence with the Indiana Department of Labor. To the extent Plaintiff failed to exhaust his administrative remedies under the IWCA, his IWCA claim is barred for that reason as well. *See e.g., Packer v. Tr. of Ind. Sch. of Med.*, 73 F. Supp. 3d 1030, 1040 (S.D. Ind. 2014), *aff'd* 800 F.3d 843 (7th Cir. 2015).

3)  Customarily and regularly direct the work of two or more other employees; and

4)  Have the authority to hire or fire other employees or make suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees which are given particular weight.

29 C.F.R. § 541.100(a); *Grass v. Damar Servs., Inc.*, No. 1:13–cv–00310–JMS–DML, 2014 WL 2773027, at *9 (S.D. Ind. Jun. 19, 2014). Because Davis's work as a Facilities Supervisor satisfied each of those elements, he was an executive employee exempt from FLSA overtime requirements. 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.100(a).

1.   <u>Davis's Salary Was Significantly More Than $455 Per Week.</u>

To qualify as a "bona fide executive," an employee must receive a salary of at least $455.00 per week (approximately $23,000.00 per year). 29 C.F.R. § 541.100(a)(1). Davis's annual base salary from November 1, 2015 through his termination of employment on or around July 28, 2016, was $64,084.80, or approximately $1232.40 per week. (Davis Dep. at 83:20-84:1 & Ex. 3). Davis's salary therefore significantly exceeded the necessary $455 per week threshold.

2.   <u>Davis's Primary Duty Was Management of a Customarily Recognized Department.</u>

To qualify as an exempt executive employee, an employee must have as a primary duty the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof. 29 C.F.R. § 541.100(a)(2). Davis meets each of the three subparts of this test. 29 C.F.R. § 541.100 *et seq.*

a.   The Facilities Department at Women's Hospital is a Customarily Recognized Department or Subdivision.

A "customarily recognized department or subdivision is intended to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function. A customarily recognized department or subdivision

29

must have a permanent status and a continuing function." 29 C.F.R. § 541.103(a). The FLSA

regulations make clear, however, that

> [C]ontinuity of the same subordinate personnel is not essential to the existence of
> a recognized unit with a continuing function. An otherwise exempt employee will
> not lose the exemption merely because the employee draws and supervises
> workers from a pool or supervises a team of workers drawn from other recognized
> units, if other factors are present that indicate that the employee is in charge of a
> recognized unit with a continuing function.

29 C.F.R. § 541.103(d). "[G]roupings" or "teams" may constitute a department or subdivision.

69 Fed. Reg. 22134 (Aug. 23, 2004), citing *Gorman v. Cont'l Can Co.*, No. 76 C 908, 1985 WL

5208 (N.D. Ill. Dec. 31, 1985)).

Employees of the Facilities Department at Women's Hospital were permanently assigned

to provide facilities services there, and were responsible for all facilities operations at Women's

Hospital. (Waller Decl., ¶ 28). In addition, Davis's role within the department was consistent and

permanent; he performed the same supervisory role from January 1, 2015 through his

termination from employment, effective on or about July 28, 2016. (Davis Dep. at 18:18-25;

Matthews Decl., ¶ 5; Lovelace Decl., ¶ 5; Waller Decl., ¶ 5). Moreover, Davis supervised at least

two facilities technicians, including Trivett and Lovelace, throughout his tenure. (Davis Dep. at

21:2-11, 31:12-14, 32:17-33:2-16, 34:13-18, 80:4-14; Breeze Dep. at 42:18-43:2; Callis Decl., ¶

8; Lovelace Decl., ¶¶ 5-6) *See West*, 137 F.3d at 752; *Molina*, 2 F.Supp.2d at 185. Therefore,

Davis managed a customarily recognized department or subdivision.

> b.   Davis's Duties were "Management" Duties.

Next, Davis's primary duties were management in nature. The term "management"

generally includes, but is not limited to, activities such as the following:

> [1] interviewing, selecting, and training of employees; [2] setting and adjusting
> their rates of pay and hours of work; [3] directing the work of employees; [4]
> maintaining production or sales records for use in supervision or control; [5]
> appraising employees' productivity and efficiency for the purpose of

recommending promotions or other changes in status; [6] handling employee complaints and grievances; [7] disciplining employees; [8] planning the work; [9] determining the techniques to be used; [10] apportioning the work among the employees; [11] determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; [12] controlling the flow and distribution of materials or merchandise and supplies; [13] providing for the safety and security of the employees or the property; [14] planning and controlling the budget; and [15] monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. This list is not intended to be exhaustive and other activities, evaluated on a case-by-case basis, may be considered managerial. 69 Fed. Reg. 22133 (Aug. 23, 2004); *Hicks v. Mercedes-Benz U.S. Int'l, Inc.*, 877 F. Supp. 2d 1161, 1168 (N.D. Ala. 2012) ("[T]he regulations are clear that these factors, while helpful, are not exhaustive.").

Davis performed management duties in nearly all of the 15 categories listed above. For example, Davis participated in interviewing job applicants and recommending which applicants should be hired. (Davis Dep. at 51:24-52:2, 78:24-79:18; Callis Decl., ¶¶ 7-8). At least two facilities technicians, Lovelace and Trivett, reported to Davis during his employment at Medxcel, and he reviewed the timecards of those individuals and approved requested days off. (Davis Dep. at 21:2-11, 30:1-3, 31:12-14, 32:17-33:2-16, 34:13-18, 80:4-14, 81:17-21; Breeze Dep. at 42:18-43:5; Callis Decl., ¶ 8; Lovelace Decl., ¶¶ 5-6). He also provided day-to-day direction to the facilities staff. (Davis Dep. at 38:25-39:2; Gordon Dep. at 112:10-15). He directed his technicians regarding how to prioritize their work orders and plan their day-to-day tasks. (Davis Dep. at 48:7-49:11; Gordon Dep. at 114:13-19; Callis Decl., ¶ 7; Lovelace Decl., ¶ 6). Davis was involved in disciplining his subordinates through verbal counselings. (Davis Dep. at 76:25-77:6; Breeze Dep. at 43:11-18; Callis Decl., ¶ 8). He also participated in the decision to terminate a technician, and communicated the decision to the technician. (Davis Dep. at 52:7-18; Callis Decl., ¶¶ 7-8).

31

Davis was also involved in the bid process for certain vendors and contractors and overseeing those contractors' projects. (Davis Dep. at 59:4-11, 60:1-7; Callis Decl., ¶7). Specifically, Davis was responsible for ensuring contract compliance and vendor/contractor performance. (*Id.* at 61:1-9 & Ex. 1; Callis Decl., ¶ 7). Further, unlike the Facilities Technicians who reported to Davis, Davis was responsible for communicating with hospital leadership regarding maintenance projects and other issues. (Gordon Dep. at 114:25-115:8; Callis Decl., ¶ 7). Finally, Davis was responsible for ensuring that any repair work was in compliance with federal, state and local requirements as well as the standards of the Joint Commission, the accreditation body for health care facilities. (Davis Dep. at 63:19-64:4, 71:7-20 & Ex. 1). Davis's daily activities fit squarely within the managerial activities identified in the regulations, and consequently constitute management duties pursuant to the FLSA. 29 C.F.R. § 541.102. Thus, Davis's duties as a Facilities Supervisor were management duties pursuant to the FLSA.

c.    The Management Duties were Davis's "Primary" Duties.

Davis's management duties were his primary duties. Employees may retain the executive exemption even though they concurrently perform exempt and non-exempt work, so long as they otherwise meet the requirements for the exemption. *Brown v. Aleris Specification Alloys, Inc.*, No. 3:14-cv-41, 2016 WL 1183207, at **4-5 (N.D. Ind. Mar. 28, 2016).  Whether an employee in fact meets these requirements is determined on a case-by-case basis, in light of the employee's primary duties. 29 C.F.R. § 541.106(a). An employee "does not need to perform all of these duties to be a manager," however, "the more time an employee spends on managerial tasks, the more likely it is that he will be deemed a manager." *Brown*, 2016 WL 1183207, at *4 (citing *Harper v. Wilson*, 302 F. Supp. 2d 874, 881 (N.D. Ill. 2004)). Generally, exempt executives make their own decisions regarding when to perform non-exempt duties and remain responsible for the success or failure of business operations under their supervision while they perform such

tasks. In contrast, a non-exempt employee may be directed by a supervisor to perform exempt work, or may perform exempt work only for a defined period of time. 29 C.F.R. § 541.106(a).

"Primary duty" means the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). In determining an employee's primary duty, the key inquiry is the "character of the employee's job as a whole." *Id.* Here, while Davis performed maintenance tasks, (Davis Dep. at 29:14-15), his primary duty was to supervise and direct the work of the facilities technicians who reported to him.  (Callis Decl., ¶ 8; Lovelace Decl., ¶ 6). Further, as the sole Facilities Supervisor at Women's Hospital, his work as a supervisor was necessarily more important than his manual labor. *See Brown*, 2016 WL 1183207, at 5 (finding that plaintiff's primary duty was management where, *inter alia*, "as the sole supervisor on the ingot line, Brown's managerial work was necessarily more important to Aleris than his manual labor"). Thus, it is undisputed that Davis's management duties were primary.

### 3.    Davis Customarily and Regularly Directed the Work of More than Two Employees.

While Davis was Facilities Supervisor at Women's Hospital, at least two facilities technicians reported to him, including Trivett and Lovelace. (Davis Dep. at 21:2-11, 31:12-14, 32:17-33:2-16, 34:13-18, 80:4-14; Breeze Dep. at 42:18-43:2; Callis Decl., ¶ 8; Lovelace Decl., ¶¶ 5-6). This satisfies the number of subordinates required by 29 C.F.R. § 541.100(a)(3) to meet the Executive Exemption.

Davis contends that in June 2016, "Gordon removed [his] supervisory authority over his subordinates, by removing his ability to approve their work hours, time off, and overtime in the payroll system." (Dkt. #1, ¶ 25). When Gordon became the Facilities Manager at Women's Hospital, Medxcel's personnel management software incorrectly recorded that Lovelace and Trivett reported directly to Gordon rather than Davis. (Matthews Decl., ¶ 13). That was simply a

33

clerical error. (*Id*.). Davis remained their supervisor until his employment was terminated in July 2016. (*Id.* at ¶¶ 5, 13; Waller Decl., ¶ 5; Lovelace Decl., ¶ 5) (noting that "I reported to Davis until his termination in July 2016."). Indeed, Davis himself acknowledged that Breeze informed him that his responsibilities would not change when Gordon became his supervisor. (Davis Dep. at 154:2-6). Further, Davis was still responsible for the daily instruction of his technicians. (*Id*. at 155:20-22).

    4.   <u>Davis's Personnel Recommendations Were Given Particular Weight.</u>

Finally, an exempt executive employee must either have "the authority to hire or fire other employees" or his "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees must be given particular weight." 29 C.F.R. § 541.100(a)(4). An executive's suggestions and recommendations can have "particular weight" even if they can be overruled by a higher level manager and the executive does not have ultimate authority to implement the suggestion or recommendation. 29 C.F.R. § 541.105.

Here, the undisputed evidence demonstrates Davis participated in interviewing job applicants and recommending which applicants should be hired. (Davis Dep. at 51:24-52:2, 78:24-79:18; Callis Decl., ¶¶ 7-8). He also participated in the decision to terminate a technician and was the individual who communicated that decision to the technician. (Davis Dep. at 52:7-18; Callis Decl., ¶¶ 7-8). At a minimum, Davis's personnel recommendations were given "particular weight" sufficient to satisfy this element of the Executive Exemption. Thus, Medxcel properly classified Davis as an exempt employee not entitled to overtime compensation. Medxcel is entitled to summary judgment on Davis's wage claims.

## IV.   CONCLUSION

For the reasons set forth above, Davis's age and disability discrimination claims are baseless, and Medxcel respectfully requests summary judgment on both claims. Additionally, Medxcel properly classified Davis as an executive employee exempt from the overtime requirements set forth in the FLSA and the Indiana Wage Claims statute. Medxcel does not owe Davis for any unpaid wages. As such, Medxcel respectfully requests summary judgment on those claims.

Respectfully submitted,

*/ s / Alan L. McLaughlin*
Alan L. McLaughlin (#10182-49)
Emily L. Connor (#27402-49)

LITTLER MENDELSON, P.C.
111 Monument Circle, Suite 702
Indianapolis, IN 46204
Telephone: 317.287.3600
Facsimile:  317.636.0712
E-mail: amclaughlin@littler.com
            econnor@littler.com

*Attorneys for Medxcel Facilities Management, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this 14th day of March 2018, filed a copy of the foregoing

*Defendant's Brief in Support of Motion for Summary Judgment* electronically.   Notice of this

filing will be sent to the following parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

Kathleen A. DeLaney
Annavieve C. Conklin
DeLANEY & DeLANEY LLC
3646 North Washington Blvd.
Indianapolis, IN  46205


*/ s / Alan L. McLaughlin*

Firmwide:153403303.1 077095.1009

36