UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

PAUL DAVIS,                             )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )        Case No. 1:17-cv-00790-RLY-MJD
                                        )
MEDXCEL FACILITIES                      )
MANAGEMENT, LLC,                        )
                                        )
        Defendant.                      )

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt 33)**

## I.       STATEMENT OF MATERIAL FACTS IN DISPUTE

Davis identifies the following disputed material facts: (1) whether Davis worked as a bona fide executive; (2) whether Medxcel held Davis to unreasonable work standards; (3) whether Davis met legitimate expectations; (4) whether Gordon made discriminatory, age based comments about Davis; (5) whether Gordon harbored a discriminatory animus toward Davis because of his disability; (6) whether Davis would not have been disciplined and terminated but for his age; (7) whether Davis would not have been disciplined and terminated but for his disability; (8) whether Medxcel treated younger employees more favorably than Davis; (9) whether Gordon created a hostile work environment on the basis of disability and age.

## II.      STATEMENT OF FACTS

Davis graduated high school in 1972, and completed a plumbing apprenticeship. [Dkt 36-7 at 4-5 (Davis Tr. 10:22-11:20)]. After working twenty years in a family plumbing, heating, and air conditioning business, Davis started at St. Vincent Women's Hospital in June 2006. [Dkt 36-7 at 6, 9-10 (Davis Tr. 12:3-10, 17:20-18:4)]. He began as a Facilities Mechanic and was promoted to Facilities Supervisor in 2013. [Dkt 35-2 at 5 (Davis Tr. 18:10-17)]. He never

1

received any type of disciplinary action from St. Vincent.[1] [Dkt 36-7 at 67 (Davis Tr. 248:13-19)].

Davis was highly regarded by Women's Hospital staff, including Doctors, Nurses, and Technicians. He was a great communicator, kind, compassionate, polite, and personable, and got along well with staff. [Dkt 36-8 (Cable Aff. ¶¶ 5-6, 9); [Dkt 36-9 (Von Lienen Aff. ¶ 4-5, 8)]; [Dkt 36-10 (Burton Aff. ¶¶ 5-7, 9)]; [Dkt 36-11 (Cash Aff. ¶¶ 5-8); [Dkt 36-12 (Corbett Aff. ¶ 4-5, 8)]; [Dkt 36-13 (Hostetler Aff. ¶¶ 5-6); [Dkt 36-14 (T. Davis Aff. ¶¶ 5, 7-8)]; [Dkt 36-15 at 6 (Lancaster Tr. 22:20-21)]; [Dkt 36-16 (Hoffman Aff. ¶¶ 5-6)]; Dkt 36-17 (Anderson Aff. ¶¶ 4-5)]. Hospital staff praised Davis for being prompt, efficient, flexible, available, dedicated, dependable, and great at prioritizing. *Id.* Taking care of the entire Women's Hospital was a big job, and Davis handled it well, always staying on top of his work. *Id.*

### A.  St. Vincent transferred its maintenance department to Medxcel.

On January 1, 2015, St. Vincent Hospital outsourced facilities maintenance to Medxcel, a for-profit company. [Dkt 1 at 1 (Complaint ¶ 3); Dkt 11 at 2 (Answer ¶ 3)]. Wayne Fairburn had been Davis' supervisor, and he promoted Davis to Facility Supervisor in 2013. (Davis Tr. 23:14-22). In early 2015, Medxcel replaced Fairburn with Jason Callis, and Davis began reporting to Callis, who was primarily located at St. Vincent's 86th Street facility. [Dkt 35-2 at 9 (Davis Tr. 24:2-22)]. Callis reported to Mitch Breeze. [Dkt 35-2 at 10 (Davis Tr. 25:2-13)]. Callis asked Davis to also supervise the St. Vincent Stress Center, a separate facility. [Dkt 35-2 at 17 (Davis

---

[1] Medxcel notes that Davis was terminated by a previous employer for "failing to report a serious safety incident, resulting in an unoccupied building filling up with gas." Def.'s Br. at 2, n. 2. This is completely irrelevant and prejudicial to Davis' lawsuit, and grossly mischaracterizes Davis' testimony. Over ten years ago, before Davis was employed by St. Vincent, Davis was employed by Michiana Contracting. [Dkt 36-7 at 7-8 (Davis Tr. 14:25-15:24)]. An employee who reported to Davis forgot to tighten a gas line union, and turned the gas on to an unoccupied building which then filled up with gas. *Id.* Davis quickly discovered the mistake and took care of it. *Id.* He did not report the incident because there was no harm done. *Id.* Davis was nevertheless terminated for not reporting the incident. *Id.*

Tr. 33:1-10)]. Davis remained primarily located at the Women's Hospital, but supervised one Facilities Technician at the Stress Center. [Dkt 35-2 at 18 (Davis Tr. 34:13-18)].

### B.    Davis was a working supervisor with Medxcel.

Under Medxcel, Davis was a "working supervisor", completing work orders and ensuring that the hospital was maintained in a safe condition. [Dkt 35-2 at 13 (Davis Tr. 29:5-23)]. He handled emergencies, passing them on to upper management if necessary, and originally, reviewed time cards of Facilities Technicians. [Dkt 35-2 at 13-14 (Davis Tr. 29:24-30:5)]. Davis never saw a job description for Facilities Supervisor. [Dkt 35-2 at 19 (Davis Tr. 36:13-18); Dkt 35-2 at 107-109]. Breeze testified that Davis became Facilities Supervisor "by default," as the longest tenured employee. [Dkt 36-18 at 9 (Breeze Tr. 32:13-20)]. Shortly before Medxcel took over, two facilities technicians were terminated, and only two facilities technicians reported to Davis. [Dkt 35-2 at 15-16 (Davis Dep 31:15-32:21)].

### C.    Medxcel reclassified Davis to salaried, exempt, in November 2015.

While Davis was an hourly, non-exempt employee, Callis instructed him not to work any overtime unless Callis approved it. [Dkt 36-7 at 14 (Davis Tr. 43:8-17)]. On November 4, 2015, Medxcel reclassified Davis from hourly, non-exempt, to salaried, exempt. [Dkt 35-2 at 41 (Davis Tr. 88:7-20)]. Davis' pay was based on a 40-hour week, and Callis instructed him to comp his time if he was called in outside of his regular hours. *Id.* Callis instructed Davis not track his hours, and the computer systems changed so that Davis could no longer track his time. [Dkt 36-7 at 60-61 (Davis Tr. 240:21-241:7)]. Davis tried, but was unable to keep his hours to 40 per week, and routinely worked at least three to five hours of overtime per week. [Dkt 35-2 at 41 (Davis Tr. 89:14-23)]. From November 2015 through July 2016, Medxcel paid Davis no overtime. [Dkt 36-7 at 61 (Davis Tr. 241:8-15); Dkt 36-19 at 26-27 (Gordon Tr. 106:24-107:2)].

3

**D.      Two minor verbal warnings led up to his Performance Development Plan.**

In May of 2015, there was a water main break at the Women's Hospital while the management team was out of town. [Dkt 35-2 at 48-49 (Davis Tr. 102:18-103:8)]. The Grounds Supervisor usually handled repairs of outside water mains, so Davis contacted him. *Id.* The Grounds Supervisor arrived at around 5:00 p.m. and said, "Well, there's really nothing we can do about it tonight. We'll get on it first thing in the morning and schedule people." *Id.* Callis reprimanded Davis for not calling Callis, who was out of town, to report the break. *Id.*

The Women's Hospital air handling units are very sensitive to power outages or "blips." [Dkt 35-2 at 49-50 (Davis Tr. 103:14-104:22)]. Leading up to an incident in November 2015, over a two-week period, the operating room air handling unit tripped out twice. *Id.* Each time, Davis sent an electrician to rule out shorts, and called Indianapolis Power & Light ("IPL"), to verify whether blips could have caused the unit to trip. *Id.* Both times, IPL confirmed there was a blip. *Id.* A few days later, the air handler went down again, this time because a bolt had come loose. *Id.* Callis blamed Davis for not doing enough investigating, and gave an oral warning. *Id.*

**E.      Davis is placed on a 60-day Performance Development Plan.**

On March 30, 2016, Callis met with Davis, and Eric Waller, the District Regional Director. [Dkt 35-2 at 52-53 (Davis Tr. 106:7-107:25)]. Waller said he got a scathing email from a Women's Hospital executive about conditions at the Women's Hospital, and wanted to take a look at some of the areas mentioned. *Id.* Waller pointed out mix-matched ceiling tiles in an empty that he said "wouldn't pass." *Id*. Waller said, "I've seen enough." *Id.* They went to a conference room, and Waller said, "I should fire you right here and now." *Id.* Davis explained that he had already spoken with Callis about changing the ceiling tiles, and was told that Medxcel's policy did not encompass that work, because the Hospital had to agree to pay for that

4

type of change. *Id.* Waller asked if Davis had checked to see whether those particular ceiling tiles were still available. *Id.* Davis had checked, and they were not. *Id.* Waller and Callis gave Davis a Performance Development Plan ("PDP"); Dated March 30, 2016. *Id.*; [Dkt 35-2 at 121-23].

Davis completed part of the PDP, "Action Employee Will Take to Bridge Gaps." [Dkt 35-2 at 54 (Davis Tr. 108:13-22); Dkt 35-2 at 121-23]. Zach Matthews, an HR Representative, agreed to be Davis' HR Representative at the next meeting. [Dkt 35-2 at 54-55 (Davis Tr.108:24-109:12)]. When Davis, Waller, Callis, and Matthews all met again, Matthews told Davis he was doing an excellent job, and putting the responsibility back onto Callis, where it is supposed to be. [Dkt 35-2 at 55-56 (Davis Tr. 109:13-110:14)].

### F.   Callis gave Davis a warning dated December 7, 2015, on March 30, 2016.

Callis also gave Davis a Discipline Notice, dated December 7, 2015. [Dkt 35-2 at 54 (Davis Tr. 108:4-11); Dkt 35-2 at 116-20]. When Davis told Callis that he had never seen this Discipline Notice, Callis said, "Oh, I forgot to give it to you in December," and instructed Davis to sign and backdate the document.[2] [Dkt 35-2 at 45-46 (Davis Tr. 95:18-96:3)]. Callis did give Davis a *verbal* warning in December 2015, for using the word "crap" in an email to a purchasing agent, but the written warning came in March 2016, and no emails were attached. [Dkt 36-7 at 18 (Davis Tr. 98:14-25)]. Davis protested that he had never seen the written warning, and it was unfairly used to support the PDP. [Dkt 35-2 at 54 (Davis Tr. 108:4-11)].

### G.   Davis worked with Callis to meet the goals set out in his PDP.

The March 30, 2016, PDP was to last to May 29, 2016. [Dkt 35-2 at 121-23]. Davis and Callis met to work together on the goals in the PDP. [Dkt 35-2 at 56-57 (Davis Tr. 110:16-111:2)]. The first point was "following proper procedure for escalating emergent situation to

---

[2] Breeze does not recall reviewing the December 7, 2015 warning. [Dkt 36-18 at 4 (Breeze Tr. 17:14-17)].

senior leadership," which referred to the water main break and air handling motor failure, which Davis was already counseled on. [Dkt 36-7 at 21 (Davis Tr. 114:4-12); Dkt 35-2 at 121-23].

The second point, "Not effectively managing staff," referred to Law and Whitfield. [Dkt 35-2 at 121-23]. Law had attendance issues, and Whitfield had performance ones. [Dkt 36-7 at 22, 19-20 (Davis Tr. 115:7-19, 110:16-111:2)]. Davis addressed it, and Gordon testified that both employees were terminated after progressive discipline. [Dkt 36-7 at 23 (Davis Tr. 116:4-9); Dkt 36-19 at 3-4 (Gordon Tr. 13:22-24, 16:14-16)].

The third point was about communication in a professional, non-aggressive manner consistent with core values. [Dkt 35-2 at 121-123]. This referred to the email from Davis' backdated December 2015 warning, as well as "Controlling frustration and not using emotions." [Dkt 35-2 at 116-23; Dkt 36-7 at 23-24 (Davis Tr. 116:21-117:24)].

The fourth point, "Facility EOC Quality," referred to ceiling tile damage, discoloration, style, and age. [Dkt 35-2 at 121-123]. Callis initially wrote, "Jason will work with Paul to develop a daily rounding program," but crossed out the word "daily," and changed it to "weekly," because daily rounding of the 300,000 square foot hospital was not feasible. [Dkt 35-2 at 121-123; Dkt 36-7 at 25-26 (Davis Tr. 122:9-123:17)]. Callis and Davis agreed to divide the hospital into four sections, with one section to be completed each week, so that the entire hospital would be EOC rounded every month. *Id.* Callis requested that Davis obtain quotes to replace all the ceiling tiles, so that he could present them to hospital staff to obtain funding to have the ceiling tiles replaced. [Dkt 35-2 at 58 (Davis Tr. 124:10-2)].

The fifth point dealt with managing work order systems effectively, including CMS, FMOS, PO. Callis did not know how to do FMOS reporting, but he and Davis could learn together. (Davis Tr. 110:16-25). Callis expressed no additional concerns during the PDP and

never raised any performance issue in the PDP again. [Dkt 36-7 at 19-20 (Davis Tr. 110:16-111:20; Dkt 35-2 at 58 (Davis Tr. 124:23-25)].

### H.     Gordon replaced Callis as Davis' supervisor.

In May 2016, Davis was called into Breeze's office, and on his way, he passed Callis, who appeared visibly upset. [Dkt 36-7 at 27, 61-62 (Davis Tr. 130:2-11, 241:20-242:2)]. Breeze said Callis had been removed from Women's Hospital and Gordon would be his new manager. [Dkt 36-7 at 27, 62 (Davis Tr. 130:2-11, 242:5-9)]. Breeze told Davis that his responsibilities and duties would remain exactly the same, but Gordon would take construction projects off of his plate. [Dkt 35-2 at 69 (Davis Tr. 154:2-7); Dkt 35-4 at 6 (Gordon Tr. 35:11-17)]. This was the first time Davis met Gordon. [Dkt 36-7 at 27 (Davis Tr. 130:12-13)].

Davis reached out to shake Gordon's hand, and said, "Welcome aboard." [Dkt 36-7 at 62-63 (Davis Tr. 242:9-243:3)]. Gordon said nothing. *Id.* Davis got the feeling that Gordon looked at him as a white-haired old man that he didn't want to have around. *Id.* From the very get-go, Davis had a strong feeling that he was not going to be welcomed by Gordon. *Id.*

The next day, Gordon shut the door to Davis' office, and said, "Oh, I see you're not following the performance development plan." [Dkt 35-2 at 61-62 (Davis Tr. 131:17-132:17)]. Davis said, "Yes, I am." Gordon replied, "Well, if you were [following the PDP], you would have it posted right up here on your wall so that you could look at it every day." *Id.*

### I.     Gordon held Davis to unreasonable rounding requirements.

 The next day, Gordon pulled a chair into Davis' office, directly behind Davis, cornering him with no room to move. [Dkt 35-2 at 63 (Davis Tr. 133:7-21)]. Gordon told Davis to complete daily EOC rounding. *Id.* Davis objected, explaining that the 300,000 square foot hospital was too big for daily rounding, and that he was doing weekly rounding. [Dkt 35-2 at 63-

64 (Davis Tr. 133:7-134:11)]. Gordon responded that his subordinates at the Seton facility were rounding daily. *Id.* Davis replied, "I understand that, but [Seton is] a 65,000 square foot building. I have over 300,000 square feet. It would take my whole day just to do nothing but rounding." *Id.* Gordon immediately became upset, slammed his computer shut, pushed his chair back, and said, "I don't need this pushback.[3] I've got younger people over at Seton Specialty that could come over and do the job if you can't," and left.[4] *Id.*

When Gordon returned, Davis again explained that daily rounding of the entire hospital would be impractical, and would make it impossible for Davis to perform other duties. [Dkt 36-7 at 28-29 (Davis Tr. 134:19-135:11)]. He explained he was doing once-a-week rounding of one quarter of the hospital, so that the entire hospital is fully inspected every four weeks. *Id.* Gordon responded, "That's not good enough. I want it done." *Id.* Gordon then said that Davis could do once-a-week rounding of the entire hospital, rather than daily rounding of the entire hospital. *Id.* Davis did the best he could with weekly rounding. [Dkt 36-7 at 30 (Davis Tr. 136:13-15)]. Gordon also reassigned daily rounding of the power plant from the Power Plant Operator Dan Lovelace, to Davis. [Dkt 36-7 at 11, 34 (Davis Tr. 35:17-18, 140:14-22)]. When Davis asked why, Gordon said, "Because that's what I want." *Id.*

At a meeting with Breeze and Davis, Gordon asked whether Davis had a daily or weekly meeting with his coworkers, and Davis provided paperwork showing that he had. [Dkt 36-7 at 30-31 (Davis Tr. 136:16-137:21)]. Gordon asked if Davis was reviewing ten percent of the work orders completed, and Davis reported that he had. *Id.* Gordon asked about daily rounding, and

---

[3] Gordon admits that he told Davis, on at least one occasion, that he didn't need "pushback" from him. [Dkt 35-4 at 34 (Gordon Tr. 121:21-23)].

[4] Gordon had three facilities technicians working for him at the Seton facility, all in their late twenties or early thirties. [Dkt 36-7 at 35-36 (Davis Tr. 143:15-144:2)].

Davis reported that he did not have time to do daily rounding of the entire facility. *Id.* Davis was asked to leave the meeting. [Dkt 36-7 at 32 (Davis Tr. 138:7-12)].

A week later, Gordon entered Davis' office, and said, "Well, I presume you have done everything but the daily rounding because you told me you didn't do it." [Dkt 36-7 at 32-33 (Davis Tr. 138:16-139:6)]. Davis responded, "That was the week before. I did this week's." *Id.* Davis had stayed an hour late every day that week, and came in on Sunday for four hours, to complete the rounding that week, and wrote all of the issues up onto work orders. [Dkt 36-7 at 40 (Davis Tr. 152:9-14)]. Davis handed Gordon paperwork showing that he had completed rounding. [Dkt 36-7 at 32-33 (Davis Tr. 138:16-139:6)]. Gordon turned around and threw all of the papers in the trash.[5] *Id.*

### J. Medxcel removed Davis' supervisory authority over other employees.

On May 19, 2016, Callis sent an email to HR, copied to Breeze, that effective immediately, Davis and the other two facilities technicians would report to Gordon. [Dkt 35-2 at 136-137]; Dkt 36-18 at 10 (Breeze Tr. 44:1-23)]. Callis attached an organizational chart, reflecting that Lovelace and Trivett would report to Gordon, effective May 23, 2016 – the day Gordon became Davis' supervisor. [*Id.*; Dkt 36-19 at 25 (Gordon Tr. 97:17-22)]. Davis' authority to approve paid time off for the facilities technicians was removed, and shifted to Gordon. [Dkt 36-18 at 11-12 (Breeze Tr. 45:20-46:1); Dkt 36-19 at 26 (Gordon Tr. 106:8-13)].

The first pay period after May 23, 2016, Davis went to approve Lovelace and Trivett's pay, but it had already been done. [Dkt 36-7 at 41-42 (Davis Tr. 153:25-154:18)]. Two weeks later, Davis again went to approve Lovelace and Trivett's pay, and again it was already done. *Id.* Davis asked about it and Gordon said, "You don't need that responsibility right now." *Id.* Davis

---

[5] Breeze testified that, if it was true that Gordon threw Davis' reports in the trash, it would cause him concern, but he did not know whether it was true, and he did not ask Gordon about it because he did not find out until after Davis' termination. [Dkt 36-18 at 8 (Breeze Tr. 25:12-24)].

then contacted HR, which confirmed that his authority to approve the hours that the facilities technicians submitted for pay, PTO requests, and overtime, had been removed. [Dkt 35-2 at 69-70 (Davis Tr.154:19-155:10)]. Gordon was solely responsible for all three functions. [Dkt 36-19 at 26 (Gordon Tr. 106:8-14)]. Gordon also removed Davis' ability to approve purchase order requests. Previously, if one of the two facilities technicians put in a purchase order request, it went to Davis. [Dkt 36-7 at 64 (Davis Tr. 244:6-18)]. Gordon changed the system so that requests bypassed Davis, directly to Gordon. *Id.* Gordon also diminished Davis' role on engaging contractors. [Dkt 36-7 at 71 (Davis Tr. 252:1-10)].

**K.      Davis served as a "team lead," while Gordon was the de facto supervisor.**

Gordon's job duties included regulatory documentation, relationships with hospital leadership, implementing new processes and procedures, monitoring work orders, ensuring that work is completed correctly and the hospital is maintained appropriately, and supervision of maintenance technicians (including helping with daily activities, ensuring they are familiar with relevant procedures and policies, keeping an eye on inspection dates, managing PTO and overtime, managing schedules, and doing performance evaluations and training for maintenance staff). [Dkt 36-19 at 5-7 (Gordon Tr. 31:1-33:6)]. Davis was essentially a team lead. Gordon testified that the *only* reason a "team lead" would not have been a more accurate description of Davis' role, is because a "team lead" would have less communication with hospital leadership than a supervisor. [Dkt 35-4 at 28-29 (Gordon Tr. 114:13-115:14)]. Gordon did not include Davis in meetings with hospital leadership. *Id.* The only way that Davis' job differed from any other facilities technician, was that Davis was responsible for daily oversight of the technicians, preventative maintenance and work order completion, ordering parts, and helping other technicians with repairs and maintenance. *Id.* On June 23, 2016, Gordon wrote, "I think the

10

supervisor role could just be a team lead." [Dkt 36-19 at 11-12 (Gordon Tr. 58:24-59:7)]; [Dkt 35-4 at 39-42]. Davis wore the same uniform as Lovelace and Trivett, while Gordon wore dress clothes. [Dkt 36-19 at 30-31 (Gordon Tr. 111:19-112:9); Dkt 36-14 at 5 (T Davis Aff. ¶ 14)].

Davis never had authority to hire or fire employees. [Dkt 35-7 at 14 (Breeze Tr. 43:8-10); Dkt 36-19 at 32 (Gordon Tr. 113:3-5)]. Callis had Davis participate in two interviews, but Callis decided whether to hire. [Dkt 35-2 at 25-26 (Davis Tr. 51:24-52:2)]. Once, Davis reported to Callis that one employee failed to report to work, Callis took the issue to HR, and Medxcel terminated the employee. [Dkt 35-2 at 26 (Davis Tr. 52:7-19)]. On the date of the termination, Callis was on vacation, so Davis and Breeze terminated the employee together. *Id.* Gordon excluded Davis from the interview process entirely. [Dkt 36-7 at 63 (Davis Tr. 243:19-23)]. Several positions opened up, but when Davis asked about interviews, Gordon said, "I have already done that." [Dkt 35-2 at 70 (Davis Tr. 155:9-17)]. Gordon testified that he never got input from Davis on any personnel decision. [Dkt 36-19 at 32 (Gordon Tr. 113:6-11)].

The Medxcel job description – which Davis had never seen before – does not accurately describe his duties. [Dkt 35-2 at 19 (Davis Tr. 36:13-18); Dkt 35-2 at 107-09]. Breeze testified that the Facilities Supervisor job description is for the three Facilities Managers who reported directly to him, including Mr. Gordon. [*Id.*; Dkt 36-18 at 3 (Breeze Tr. 8:14-20)].[6] Davis' primary duties included helping manage facilities technician workloads, preventative maintenance, ordering parts, and completing work orders. [Dkt 36-19 at 31, 32 (Gordon Tr. 112:10-17, 113:16-18)]. Although other facilities technicians could order materials or parts, they were shorthanded and it was easier for Davis to order all parts so the other facilities technicians could continue completing work orders. [Dkt 36-7 at 12-13 (Davis Tr. 39:12-40:13)]. Davis was

---

[6] The job description states that the Facilities Supervisor reports directly to the Director of Facilities Management. [Dkt 35-2 at 107-109]. However, Davis reported to Gordon, who was the Facility Manager. (Breeze Tr. 111:9-12). Gordon reported to Breeze, the Director of Facilities Management. [Dkt 36-18 at 3 (Breeze Tr. 8:9-13)].

only permitted to make minor purchases, under $1,000, and had no budgeting responsibility. [Dkt 36-19 at 30, 33 (Gordon Tr. 111:5-8, 116:12-16); Dkt 36-7 at 65 (Davis Tr. 246:11-15)]. Davis did not develop strategic and operational policies and plans and was not responsible for legal compliance. [Dkt 36-19 at 27-28, 33-34 (Gordon Tr. 107:24-108:3, 116:17-117:1); Dkt 36-7 at 65 (Davis Tr. 246:16-19)]. Davis did not train employees, did not do performance evaluations, did not set or adjust rates of pay, and did not approve time in the payroll system. [Dkt 36-19 at 29 (Gordon Tr. 109:2-4); Dkt 35-4 at 27, 29 (Gordon Tr. 112:18-23, 115:15-22)]. Davis referred employee complaints to his supervisor, and had no authority to issue discipline. [Dkt 36-7 at 65 (Davis Tr. 246:5-10, 20-24); Dkt 35-2 at 121-23].

### L.    Gordon instructed Davis to work more than 40 hours per week.

Gordon was aware that Davis' work hours were 7:00 a.m. to 3:30 p.m. [Dkt 35-4 at 25 (Gordon Tr. 102:17-20)]. However, many times, approximately 3:20 or 3:30 p.m., Gordon would show up at Davis' office and ask to go over the events of the day. [Dkt 36-7 at 66-67 (Davis Tr. 247:20-248:7)]. This generally caused Davis to stay an extra half hour to an hour after he was scheduled to leave. *Id.*

Davis was not paid for overtime after November 2015. [Dkt 36-7 at 17 (Davis Tr. 86:1-4)]. Because Davis lived so close to Women's Hospital, both Hospital staff and Medxcel staff called Davis rather than other technicians. [Dkt 36-7 at 15 (Davis Tr. 74:19-25)]. Davis was continuously on call, 24 hours per day, 7 days per week. [*Id.* at 74:3-7]. Davis estimates that he was called in on his off-hours at least twice a week. [*Id.* at 74:12-13]. Although other facilities technicians were scheduled to be on call, Davis handled about 50% of the on-call work himself. [Dkt 36-7 at 16 (Davis Tr. 75:1-25)]. Although facilities technicians at 86th Street were supposed

12

to cover on-call work at Women's Hospital, they rarely did so because they were not familiar enough with Women's Hospital, and would call Davis instead. *Id.*

Hospital staff felt that they could call Davis any time, and often saw Davis working before hours, after hours, on weekends, and holidays. Davis' wife testified that she was present when Davis received calls in the middle of the night. [Dkt 36-8 (Cable Aff. ¶ 4)]; [Dkt 36-9 (Von Lienen Aff. ¶ 40)]; [Dkt 36-10 (Burton Aff. ¶ 4)]; [Dkt 36-11(Cash Aff. ¶¶ 4-5)]; [Dkt 36-12 (Corbett Aff. ¶¶ 4-5)]; [Dkt 36-13 (Hostetler Aff. ¶ 4)]; [Dkt 36-16 (Hoffman Aff. ¶ 5)]; [Dkt 36-17(Anderson Aff. ¶ 4)]; [Dkt 36-14 (T. Davis Aff. ¶¶ 4-7)]; [Dkt 36-15 (Lancaster Tr. 9:14-10:4)].

### M.   Gordon commented about Davis' age, and treated him differently than younger employees.

One day, Gordon asked Davis, "You're thinking about retiring pretty soon, aren't you?" [Dkt 35-2 at 78 (Davis Tr. 172:9-16)]. Davis said he would retire when he was 66, four years in the future. *Id.* at 172:22-25. Gordon did not respond, but shortly thereafter, on July 7, 2016, Gordon placed Davis on a PDP. [Dkt 35-2 at 79 (Davis Tr. 173:1-4, 13-21)]. During the same meeting, Gordon also gave Davis his review. [Dkt 36-7 at 47 (Davis Tr. 174:19-21); Dkt 35-4 at 19 (Gordon Tr. 89:19-25)]. Gordon testified that, as of July 7, 2016, he did not feel he had been Davis' supervisor for a sufficient amount of time to accurately evaluate Davis' performance. [Dkt 36-19 at 18 (Gordon Tr. 87:21-23)].

Gordon made belittling, sarcastic comments right away. [Dkt 36-7 at 63-64 (Davis Tr. 243:24-244:2)]. Gordon greeted Davis sarcastically as "O' Paul Davis" daily, but Davis never heard Gordon greet anyone else this way. [Dkt 36-7 at 38 (Davis Tr. 147:4-14)]. Gordon never greeted Breeze as "O, Mitch Breeze." [Dkt 36-18 at 20 (Breeze Tr. 56:9-11)]. Gordon

consistently came into Davis' office, greeted him sarcastically, and pulled up a chair so that Davis had no way to move. [Dkt 36-7 at 33 (Davis Tr. 139:15-22)].

When Davis asked Gordon whether Davis would supervise the three facilities technicians at Seton, Gordon told Davis that Daniel Wasden, a much younger employee in his twenties, who Gordon supervised at Seton, would be a supervisor soon, and that Wasden was a smart, young individual with talent who was ready to move up the ladder. [Dkt 36-7 at 33 (Davis Tr. 139:15-140:10)]. Once, Davis had trouble with an airflow problem, and Gordon said, "I'll have [Wasden] come over. He can fix anything. He'll find it." [Dkt 36-7 at 37 (Davis Tr. 145:6-19)]. Wasden was unable to locate the issue,[7] and Medxcel hired a contractor to fix it. *Id.*

Gordon constantly criticized Davis, belittling him in front of his coworkers, while praising his younger employees. Gordon criticized Davis' repairs, and told Davis how good his younger employee Wasden was, on a daily basis. [Dkt 36-7 at 39 (Davis Tr. 148:15-22)].

## N.   Medxcel knew about Davis' serious medical condition.[8]

Davis has congestive heart failure. [Dkt 35-2 at 71 (Davis Tr. 158:11-20)]. Davis has had a heart attack, has had open heart surgery, and has a pacemaker defibrillator. *Id.* Davis had a heart attack in 1998, and was diagnosed with congestive heart failure in 2008. [Dkt 36-7 at 3 (Davis Tr. 5:13-17)]. Davis had a pacemaker placed in 2009, and has since had five stents put in between 2007 and 2016. [Dkt 35-2 at 73 (Davis Tr. 160:1-18)]. Davis was also placed on a lifting restriction of 25 pounds, related to his heart condition, in 2008. *Id.* Davis' most recent stent surgery was in June 2016. [Dkt 35-2 at 73-74 (Davis Tr. 160:21-161:3)]. Davis' medical condition affects his walking, causing him to become out of breath, and is exacerbated by

---

[7] Gordon noted that Wasden does not "have a strong mechanical background on equipment inside of hospitals." [Dkt 35-4 at 39-42].

[8] Medxcel argues that Davis never requested medical leave or accommodation, but tellingly stops short of denying knowledge of Davis' serious medical conditions.

stressful situations or overworking, causing Davis to feel physically tired and run-down. [Dkt 36-7 at 43 (Davis Tr. 163:25-164:6)].

Davis told Callis about his medical condition and lifting restriction. [Dkt 35-2 at 74 (Davis Tr. 161:4-11)]. Callis honored the lifting restriction. [Dkt 36-7 at 46 (Davis Tr. 169:6-20)]. Gordon initially asked Davis to put 40-pound bags of salt into the water softener as part of his daily rounding. [*Id.*; Dkt 36-19 at 8-9 (Gordon Tr. 41:10-42:1)]. Davis explained that he had a lifting restriction, and Gordon said he would have someone else lift the salt. *Id.* Gordon never asked Davis to complete documentation of his lifting restriction. [Dkt 36-19 at 42 (Gordon Tr. 42:2-4)]. Davis also told Gordon that he does not handle stress well. [Dkt 36-19 at 17 (Gordon Tr. 65:11-13)]. Gordon testified that, after learning that Davis was scheduled to be off work one day in June 2016 to have a stent placed, he looked up what a stent was on his phone, and learned that Davis had a heart condition. [Dkt 36-19 at 13-14 (Gordon Tr. 60:17-61:8)]. Gordon told Breeze about Davis' heart procedure, and then Breeze later talked to Davis about it. [Dkt 36-18 at 17-18 (Breeze Tr. 52:19-53:18)].

**O.    Gordon harbored a discriminatory animus toward Davis because of his disability.**

Breeze asked Gordon to do a "brain dump" of opinions of the staff as an academic exercise. [Dkt 36-18 at 13-14 (Breeze Tr. 48:12-49:15); Dkt 35-4 at 39-42]. On June 23, 2016, Gordon emailed Breeze, stating, "Sorry it took a minute. This is what I came up with," and attaching a memorandum, drafted by Gordon, outlining the staff's strengths and weaknesses. [Dkt 35-4 at 39-42; Dkt 36-19 at 11-12 (Gordon Tr. 58:24-59:9)]. Gordon listed "health concerns and restrictions" as one of Davis' weaknesses. [Dkt 35-4 at 39-42; Dkt 36-19 at 13 (Gordon Tr. 60:2-17)]. Gordon testified that his "health concerns" about Davis included Davis' stress level, and that Davis had recently had a stent put in. *Id.* "Restrictions" referred to Davis' lifting

restriction. [Dkt 36-19 at 14 (Gordon Tr. 61:18-22)]. Breeze relied on Gordon's written assessment, because Gordon was the one interacting with the facilities employees daily. [Dkt 36-18 at 19 (Breeze Tr. 55:11-14)].

**P.     The hostile work environment prompted Davis to consider stepping down.**

Davis' medical condition could "flare up," causing him to become very tired, if stressed or overworked. [Dkt 36-7 at 43-44 (Davis Tr. 163:21-164:6)]. Davis experienced daily flare-ups when Gordon became his supervisor, and even asked if Medxcel had any programs to help him deal with the stress. [Dkt 36-7 at 44-45 (Davis Tr. 164:19-165:7); Dkt 36-7 at 22 (Gordon Tr. 93:4-10)]. It came to the point where Davis felt there was nothing he could do to make Gordon happy. [Dkt 35-2 at 81 (Davis Tr. 176:20-24)].

Gordon's expectations of Davis became so unreasonable that on June 20, 2016, Davis told Gordon and Breeze he wanted to explore stepping down from facilities supervisor, but had not made a decision yet. [Dkt 35-2 at 81] [Dkt 36-7 at 48 (Davis Tr. 176:20-177:16)], [Dkt 35-2 at 82-83 (Davis Tr. 178:3-5; 179:12-15); Dkt 35-2 at 139]. Breeze told Davis that it would take him a couple of days to come up with some answers regarding what Davis' options might be. [Dkt 36-7 at 48-49 (Davis Tr. 177:23-178:1)]. A few days later, Davis talked to Lovelace, who asked why Davis was considering stepping down, and Davis replied, "that's what Kenneth [Gordon] wants." [Dkt 35-2 at 82 (Davis Tr. 178:3-21)]. Lovelace said, "Don't give him that satisfaction." Id. So, the next day, on July 5, 2016, Davis told Gordon that he would like to stay in his current role as supervisor. (Id.; [Dkt 36-19 at 19-20 (Gordon Tr. 90:22-91:4)]. About a day later, Gordon said, "I spoke to Mitch, and you screwed up all the plans." [Dkt 35-2 at 82 (Davis Tr. 178:3-21)].

**Q.     When Davis declined to step down as Supervisor, Gordon put him on a final written warning and a track to termination.**

16

Gordon and Davis met on July 7, 2016 – just two days after Davis announced that he did not wish to step down as supervisor. [Dkt 36-7 at 50-51 (Davis Tr. 180:20-181:50; Dkt 36-19 at 19-20 (Gordon Tr. 90:22-91:7)]. Gordon showed Davis a PDP. [Dkt 36-7 at 51 (Davis Tr. 181:6-14)]. Davis said he did not agree with it, and felt that is was very unfair, but he felt that he needed to sign it in order to keep his job. *Id.*

On July 7, 2016, after just 45 days as Davis' supervisor, Gordon presented Davis with an annual review. [Dkt 36-19 at 25 (Gordon Tr. 97:17-22)]. Gordon said, "You don't need to worry. I've already talked to [Callis] all about you, and I know everything I need to know." [Dkt 36-7 at 70 (Davis Tr. 251:11-18)]. Davis stated that he disagreed with the negative comments. [Dkt 35-2 at 99-100 (Davis Tr. 205:10-206:19); Dkt 35-2 at 128-134]. Davis later provided comments and signature. *Id.* Davis put in the electronic comment section of his final review, "I do not agree," but it was taken out, and the document says "no comments available." *Id.* Davis signed the review electronically on July 15, 2016, and Gordon signed electronically on July 16, 2016.[9] *Id.* Gordon gave Davis an overall rating of 2.17, or "achieves most position standards." *Id.*

During the same July 7, 2016 meeting, only nineteen days before Davis' termination, Gordon again commented on Davis' age, "I know that you talked about retiring, but we really want to – I really want you to stay here until you're in your 80s." [Dkt 35-2 at 101 (Davis Tr. 207:11-21)]. Davis understood this comment to be discriminatory and sarcastic. *Id.*

**R. Gordon initiated Davis' termination less than fourteen days after his final written warning.**

On July 21, 2016, exactly two weeks after Gordon placed Davis on a second PDP and made discriminatory comments related to his age, Gordon sent an email to Matthews, copied to

---

[9] Breeze testified that he does a cursory review of all employees within his line of supervision, but does not recall whether he reviewed Davis' annual review before or after Davis was terminated. [Dkt 36-18 at  5-6 (Breeze Tr. 18:16-19:13)].

Breeze, requesting to terminate Davis. [Dkt 36-4]. Matthews replied later that day, "Can we meet later this afternoon to put our plan together around this. We will need to wordsmith the paperwork and submit it for legal review." *Id.* Breeze was copied, and testified that he had no concerns about the timing because Gordon told him that no progress was being made. [Dkt 36-18 at 7 (Breeze Tr. 23:14-25)].

Gordon could not identify any specific event during the two weeks between the final written warning, and his decision to terminate Davis, which gave rise to his termination, and relied only upon the five listed reasons for Davis' termination. [Dkt 36-19 at 22-23, 25 (Gordon Tr. 93:25-94:18, 97:13-25); [Dkt 36-5]. At the time of the termination decision, Gordon had only been Davis' supervisor for approximately sixty days. *Id.* Breeze relied on Gordon's assessment of Davis, accepting it at face value. [Dkt 36-18 at 19 (Breeze Tr. 55:8-14)].

On July 26, 2016, Davis was called to a meeting with Breeze, Gordon, and Zach Matthews. [Dkt 35-2 at 102-103 (Davis Tr. 208:23-209:18); Dkt 35-4 at 212 (Gordon Tr. 99:12-25)]. Gordon led the meeting, and it lasted about five minutes. *Id.* Gordon told Davis that his employment was being terminated, handed him a piece of paper. *Id.* Davis told Breeze, Gordon, and Matthews, that he felt his termination was very unfair. *Id.* No performance-related issues were discussed during the meeting. [Dkt 36-7 at 54 (Davis Tr. 210:12-14)]. Breeze said nothing during the meeting. Matthews explained COBRA insurance benefits, Davis put his keys and radio on the table, and Gordon offered to escort Davis out of the building. (Davis Tr. 210:22-211:15). They walked out of the office, Gordon said to Davis, "are you going to take the high road, or do we need to go out the back door?" [Dkt 35-2 at 104 (Davis Tr. 211:6-13)].

Between his July 7, 2016, Final Warning, and his July 26, 2016, termination, Davis had no performance-related conversation with Gordon. [Dkt 35-2 at 98 (Davis Tr. 204:12-15)].

Davis' second PDP stated that it was effective for the month of July, 2016. [Dkt 36-7 at 68 (Davis Tr. 249:17-25)]. However, Davis did not receive notice of this PDP until July 7, 2016, and was terminated on July 26, 2016. Therefore, Davis was given only two weeks to implement approximately eight to ten extra duties. [Dkt 36-7 at 69 (Davis Tr. 250:4-10)].

Hospital staff were shocked, surprised, and even hurt, upon learning of Davis' termination, and could not understand why Davis was let go. [Dkt 36-8 (Cable Aff. ¶ 7)]; [Dkt 36-9 (Von Lienen Aff. ¶ 7)]; [Dkt 36-10 (Burton Aff. ¶ 7)]; [Dkt 36-11 (Cash Aff. ¶ 7)]; [Dkt 36-12 (Corbett Aff. ¶ 6)]; [Dkt 36-13 (Hostetler Aff. ¶ 6)]; [Dkt 36-16 (Hoffman Aff. ¶ 7)]; [Dkt 36-17 (Anderson Aff. ¶ 6)]; [Dkt 36-14 (T. Davis Aff. ¶ 8].

### S.   Davis complained about discrimination shortly after his termination.

Davis did not report discrimination while employed with Medxcel, because he feared retaliation from Gordon. [Dkt 36-7 at 72 (Davis Tr. 254:1-11)]. However, on July 27, 2016, Davis emailed Breeze, copied to Matthews, responding to the performance-related issues raised in his termination notice. [Dkt 36-7 at 55 (Davis Tr. 212:3-23)]; [Dkt 35-2 at 135]; [Dkt 36-1]. Davis sent a follow-up email to Matthews, requesting to speak with him personally. [Dkt 36-1]. Before contacting an attorney, Davis had a phone call with Matthews and reported that Gordon discriminated against him. [Dkt 36-7 at 56, 72 (Davis Tr. 213:4-19, 254:12-16)]. Matthews responded, "This is the first I'm hearing of it." *Id.* The entire conversation lasted about five minutes, and Davis never heard from Matthews again. *Id.*

Davis emailed Breeze and Matthews, on the same day, adding that when Gordon asked him for the rounding reports from the previous week, and Davis handed them to Gordon, Gordon threw them in the trash. [Dkt 36-6]. Davis wrote, "This is the respect that I've received from my

manager. He has made it impossible to meet his expectations. He probably has not told you of the numerous hours extra that I put in to try to meet his expectations." *Id.*

**T.    Medxcel replaced Davis with a younger employee.**

As early as June 23, 2016, Gordon had been advocating to make Wasden the "team lead" at the Women's Hospital facility, and for Davis to become a general maintenance technician. [Dkt 36-18 at 15-17 (Breeze Tr. 50:15-52:9)]. Breeze and Gordon discussed it a few times, but a decision was not made prior to Davis' termination. *Id.* After Davis' termination, Gordon took over Davis' remaining supervisory responsibilities. [Dkt 35-4 at 24 (Gordon Tr. 101:17-19)].

Following his termination, Davis left his umbrella in his office, and asked Lovelace to collect it for him. [Dkt 36-7 at 57 (Davis Tr. 214:9-19)]. When they met outside, Lovelace said, "Well, Daniel Wasden just took over your office and your position." *Id.* Wasden was known by hospital staff as the "team lead," and replaced Davis in his former role attending daily huddles with department representatives. [Dkt 36-14 (T. Davis Aff. ¶ 9)]; [Dkt 36-8 (Cable Aff. ¶ 9)]; [Dkt 36-15 at 7 (Lancaster Tr. 24:11-23)]. Hospital staff testified that, since Davis was terminated, there has been no improvement in the maintenance department. Work orders are not completed as quickly or effectively, and the facilities team is far less communicative to hospital staff. [Dkt 36-8 (Cable Aff. ¶ 8)]; [Dkt 36-9 (Von Lienen Aff. ¶ 6)]; [Dkt 36-10 (Burton Aff. ¶¶ 8-9)]; [Dkt 36-11 (Cash Aff. ¶ 8); [Dkt 36-12 (Corbett Aff. ¶ 7)]; [Dkt 36-13 (Hostetler Aff. ¶¶ 7-8)]; [Dkt 36-17(Anderson Aff. ¶ 7)]; [Dkt 36-14 (T. Davis Aff. ¶¶ 11-12)].

**III.    ARGUMENT[10]**

**A.    Medxcel improperly reclassified Davis as exempt and denied him overtime wages in violation of the FLSA and Indiana Wage Claim Statute.**

---

[10] Davis agrees with the standard of review cited by Medxcel. [Dkt 34 at 18].

The FLSA requires employers to pay one and one-half times the regular rate for hours worked in excess of forty in a week. 29 U.S.C. § 207(a)(2)(C). The Indiana Wage Claims Statute requires that employees be paid all unpaid wages on the first regular pay day following their termination. Ind. Code § 22-2-9-2(a). Davis' unpaid wages include his overtime compensation.[11] Davis' Indiana wage claim is derivative of his FLSA claim, and are addressed together.

Medxcel relies upon the bona fide executive exemption, 29 U.S.C. § 213(a)(1), to justify denying overtime pay to a high school educated plumber, to whom it paid overtime for eleven months before reclassifying him,[12] without changing his job duties or responsibilities. "The FLSA is a remedial act and exemptions from its coverage are to be narrowly construed against employers." *Klein v. Rush-Presbyterian-St. Luke's Med. CTr.*, 990 F.2d 279, 282 (7th Cir. 1993) (citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 4 L. Ed. 2d 393, 80 S. Ct. 453 (1960)). Further, "it is the employer's burden to establish that an employee is exempt from the FLSA's overtime requirements." *Kennedy v. Commonwealth Edison Co*., 410 F.3d 365, 370 (7th Cir. 2005) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974)). Such exemptions are "applied only where it 'plainly and unmistakably comes within the statute's terms and spirit' to deny the employee overtime." *Jackson v. Go-Tane Servs.*, 56 F. App'x 267, 270 (7th Cir. 2003) (quoting *Arnold*, 361 U.S. at 390)). Evaluation of an FLSA claim "requires a thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012).

Medxcel falls well short of showing that Davis qualifies for the Executive Exemption, 29 U.S.C. § 213(a)(1). Medxcel must show that Davis met each of these requirements:

---

[11] Davis did not file a wage claim, but did notify the Office of the Attorney General of his wage claim, requesting that he be authorized to pursue the claim through a private lawsuit, on February 7, 2017. [Dkt 36-20]. The Office of Attorney General authorized Davis to pursue his wage claims through his private attorneys on or about March 7, 2017. [Dkt 36-21]. Therefore, Davis exhausted the administrative remedies available to him under the IWCS.

[12] St. Vincent paid overtime to Davis throughout the eight years he was employed.

(1) Compensated on a salary basis pursuant to § 541.600 at a rate per week of not less than $455 per week;[13]

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100 (effective until December 1, 2016). Davis earned more than $455.00 per week (or $23,000 per year). The Facilities Department is a customarily recognized department or subdivision of the Women's Hospital. However, management of the Facilities Department was not Davis' primary duty, and Davis had no authority to hire or fire other employees, and Gordon did not give Davis' recommendations any particular weight. Thus, Davis' actual job responsibilities did not satisfy two of the four required prongs.

### 1.   Davis had no authority to hire or fire employees, and his recommendations were not given any particular weight.

The Executive Exemption requires a bona fide executive to have authority to hire or fire other employees, or his suggestions and recommendations as to such decisions must be given "particular weight." 29 C.F.R. § 541.100(a)(4). Factors to consider include "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105.

Davis indisputably had no actual authority to hire or fire employees. [Dkt 35-7 at 14 (Breeze Tr. 43:8-10)]; [Dkt 36-19 at 32 (Gordon Tr. 113:3-5)]. For the first eleven months that

---

[13] 29 C.F.R. §§ 541.100 and 541.600 were amended on May 23, 2016 to establish a new rate of not less than $913 per week, effective December 1, 2016. *See* 81 F.R. 32391. However, the previously established required salary of not less than $455 per week applied throughout Davis' employment, and therefore Plaintiff cites the version of the regulation in effect prior to the May 2016 amendment, effective through December 1, 2016.

Davis worked for Medxcel under Callis' management, the company paid Davis overtime and classified him (properly) as non-exempt. [Dkt 35-2 at 35-36 (Davis Tr. 80:22-81:1)].

 In November 2015, Medxcel reclassified Davis to exempt, but made no changes to his job duties or responsibilities. [Dkt 35-2 at 39, 41 (Davis Tr. 85:16-18, 89:11-13)]. Callis allowed Davis to sit in on interviews of two Medxcel employees, but Callis made the final decision about whether to hire them. [Dkt 35-2 at 24-25 (Davis Tr. 51:24-52:2)]. Davis did report to Callis that an employee failed to report to work, but only participated in the termination of that employee because Callis was on vacation. [Dkt 35-2 at 25 (Davis Tr. 52:7-19)].

Gordon gave Davis no opportunity to make personnel recommendations at all. Gordon excluded Davis from the interview process entirely. [Dkt 36-7 at 63 (Davis Tr. 243:19-23)]. Although positions opened up, Gordon completed the interviews himself, and told Davis about them afterward. [Dkt 35-2 at 70 (Davis Tr. 155:9-17)]. Gordon testified that he never considered input from Davis on any personnel decision. [Dkt 36-19 at 32 (Gordon Tr. 113:6-11)]. Breeze sought input from Gordon – not Davis – on the strengths and weaknesses of Gordon's subordinates. [Dkt 35-4 at 39-42; Dkt 36-18 at 13 (Breeze Tr. 48:12-20)]. Medxcel failed to meet its burden on the fourth prong of the Executive Exemption.

### 2.   Management was not Davis' primary duty.

The second prong of the Executive Exemption requires that a bona fide executive's "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.100(a)(2).

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and

grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures. 29 C.F.R. § 541.102.

Defendant argues that Davis "performed management duties in nearly all 15 of the categories," but only addresses:[14] (1) interviewing, selecting, and training employees; (2); Directing the work of employees; (3); Disciplining employees; (4) apportioning work among employees; and (5) monitoring or implementing legal compliance measures. [Dkt 34 at 31-32].

First, Davis had minimal involvement in personnel decisions under Callis' management and none whatsoever when Gordon was his supervisor. [Dkt 35-2 at 25, 70, (Davis Tr. 52:7-19, 155:9-17); Dkt 36-7 at 63 (Davis Tr. 243:19-23); Dkt 36-19 at 32 (Gordon Tr.113:6-11)]. Davis was not responsible for training employees. [Dkt 36-19 at 29 (Gordon Tr. 109:2-4), Dkt 35-4 at 29 (Gordon Tr. 115:15-17)]. Davis did not set employee's hours of work, and Gordon removed any authority he had to approve employees' hours in the payroll system when Gordon became his supervisor.[15] Second, Davis only occasionally instructed the other technicians on how to do their jobs, and only when they needed assistance. [Dkt 35-2 at 22-23 (Davis Tr. 48:23-49:1)]. Third, Davis had no authority to issue disciplinary action. [Dkt 36-7 at 65 (Davis Tr. 246:20-24)]. Fourth, Davis only occasionally directed employees to prioritize certain tasks over others

---

[14] Not only did Defendant fail to present evidence that Davis performed those other duties, but Davis has established that he did not. Davis did not set or adjust rates of pay for any employees. (Gordon Tr. 115:18-22). Gordon did the performance evaluations for the facilities technicians – not Davis. (Gordon Tr. 112:18-20). Davis had no responsibility for budgeting. (Gordon Tr. 116:12-16; Davis Tr. 246:11-15). Davis was only permitted to make minor purchases, under $1,000. (Gordon Tr. 111:5-8). Davis did not develop strategic and operational policies and plans. (Gordon Tr. 107:24-108:3). Davis did not do performance evaluations. (Gordon Tr. 112:18-20). Davis referred employee complaints and grievances to his supervisor. (Davis Tr. 246:5-10).

[15] Defendant stretches to call this a "clerical error," [Dkt 34 at 33-34], but Gordon and Breeze both knew that Davis' authority to approve paid time off for facilities technicians was removed, and shifted to Gordon. [Dkt 36-18 at 11 (Breeze Tr. 45:20-46:1); Dkt 36-19 at 26 (Gordon Tr. 106:8-13)]. Davis even brought it to Gordon's attention, and Gordon told him that it was not his responsibility. [Dkt 35-2 at 69-70 (Davis Tr. 154:19-155:10)].

based on the Hospital's needs. [Dkt 35-2 at 23 (Davis Tr. 49:2-11)]. Finally, Gordon confirmed that Davis was not at all responsible for legal compliance. [Dkt 36-19 at 33-34 (Gordon Tr. 116:17-117:1); Dkt 36-7 at 65 (Davis Tr. 246:16-19)].

Although not one of the enumerated factors, Defendant also argues that "Davis was responsible for communicating with hospital leadership regarding maintenance projects and other issues." [Dkt 34 at 32]. However, Gordon testified that he excluded Davis from meetings with hospital leadership. [Dkt 35-4 at 29 (Gordon Tr.115:11-14)]. Defendant also argues that Davis was involved in the bid process for certain vendors and contractors, and overseeing those contractors' projects. [Dkt 34 at 32]. However, Davis' role with regard to engaging contractors also diminished after Gordon became his supervisor, and Davis no longer had any say about what contractors were doing, or their work schedules. [Dkt 36-7 at 71 (Davis Tr. 252:1-10)].

Moreover, to qualify for the exemption, management must be the employee's "primary duty." 29 C.F.R. § 541.700(a). Factors to consider include "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

Even if Davis did perform a few, occasional management tasks, Medxcel has no evidence that management was Davis' "primary duty," other than Callis' statement that "While [Davis] performed some maintenance tasks himself, Davis' primary duty was to supervise and direct the work of the facilities technicians who reported to him," and Lovelace's statement that Davis "directed [Lovelace] and the other facilities technician . . . to complete work orders." (Dkt 34 at 33) (citing Callis Decl., ¶ 8; Lovelace Decl., ¶ 6)). Callis' statement is completely undermined by

the fact that for the first eleven months of his management of Davis as a Medxcel employee, Davis earned overtime. Defendant also presents no evidence of how much time Davis spent on non-exempt work versus exempt work, or the relationship between Davis' salary and the wages paid to other facilities technicians performing non-exempt work. (Dkt 34 at 33). Medxcel offers no explanation of why it paid Davis overtime for eleven months before reclassifying him without changing his job duties.

The fact that Davis helped other facilities technicians prioritize work orders is not enough to make Davis an "employee employed in a bona fide executive capacity." When asked how Davis' job differed from a technician job, Gordon testified, "His job, I mean, it was daily oversight of the technicians. PM completions. Work orders. Helping them out. Ordering parts." [Dkt 35-4 at 28 (Gordon Tr. 114:13-19)]. When Gordon became Davis' supervisor, they discussed up front that Davis would simply be responsible for work orders and ensuring that PMs were completed. [Dkt 36-19 at 10 (Gordon Tr. 46:3-8)]. Davis only occasionally gave the other technicians tips on how to accomplish their work orders, and directed them to prioritize certain tasks over others based on the Hospital's needs. [Dkt 35-2 at 23 (Davis Tr. 49:2-11)]. Davis wore the same uniform as facilities technicians, while Gordon wore dress clothes. [Dkt 36-19 at 30 (Gordon Tr. 111:19-112:9); Dkt 36-14 (T. Davis Aff., ¶ 14)]. Davis was a "working supervisor," responsible for completing his own work orders, as well as ensuring that the overall Hospital was maintained. [Dkt 35-2 at 13 (Davis Tr. 29:5-21); Dkt 36-19 at 32 (Gordon Tr. 113:16-18)]. Davis was responsible for over 1,200 preventative maintenance tasks ("PMs") each month, and the other technicians also had their own PMs to complete. [Dkt 36-7 at 52-53 (Davis Tr. 198:19-199:2)]. Davis responded to 50% of the on-call maintenance work consistently throughout his time with Medxcel. [Dkt 36-7 at 16 (Davis Tr. 75:3-5)]. In fact, Davis was taking

on so much of the manual work that Gordon was supposed to delegate some of Davis' work orders to other technicians. [Dkt 35-2 at 124-127 at ¶ 14)]. Thus, Davis' primary duty was to perform the exact same type of non-exempt work that he had been performing, and was paid overtime to perform for prior to November 2015, as the other facilities technicians continued to perform while being paid overtime. Because a reasonable jury could find that management duties were not Davis' primary duties, and his personnel recommendations were not given any particular weight, Defendant is not entitled to summary judgment on Davis's FLSA or Indiana wage claims.

### B.    Medxcel discriminated against Davis on the basis of his age and disability.

The ADEA bars discrimination because of an individual's age. 29 U.S.C. § 623. Davis may proceed by introducing direct or circumstantial evidence that Medxcel terminated him because of his age, or, alternatively, through the *McDonnell Douglas* framework. *Carson v. Lake Cnty.*, 865 F.3d 526, 532-33 (7th Cir. 2017). While Davis ultimately bears the burden of proving that, "but for" his age, he would not have been terminated, on summary judgment, "a plaintiff need only offer evidence to create a genuine issue of material fact on this issue." *Yee v. UBS O'Connor, LLC*, No. 07 C 7150, 2010 U.S. Dist. LEXIS 39753, at *47 (N.D. Ill. Apr. 23, 2010).

The ADA bars discrimination against a qualified individual on the basis of disability. 42 U.S.C. § 12112(a). An ADA plaintiff "must show that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability." *Monroe v. Ind. DOT*, 871 F.3d 495, 503-04 (7th Cir. 2017) (citing *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016)). Like age discrimination, disability discrimination may be proven either through direct and circumstantial evidence, or through evidence of pretext. *Id.* at 504-05.

The Seventh Circuit has "tried to move away from the many multi-factored tests in employment discrimination cases and decide, when considering the evidence as a whole, 'whether the evidence would permit a reasonable factfinder to conclude that the [] proscribed factor caused the discharge.'" *Monroe v. Ind. DOT,* 871 F.3d 495, 503-04 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

Medxcel concedes that Davis is over the age of 40, has a disability,[16] and that he was qualified to perform the essential functions of his job with or without reasonable accommodation. Medxcel argues that Davis failed to meet his job expectations, and that no similarly situated employees received more favorable treatment. [Dkt 34 at 24-25].

### 1. Discriminatory comments from the decision-maker in the context of the adverse employment actions preclude summary judgment.

On the day after Gordon and Davis first met, before Gordon had observed Davis' work, Gordon said to Davis, "I've got younger people over at Seton Specialty that could come over and do the job if you can't." [Dkt 35-2 at 63-64 (Davis Tr. 133:7-134:11)]. Gordon consistently referred to Davis sarcastically as "O' Paul Davis" and belittled Davis in front of his coworkers, while praising his *younger* employee Daniel Wasden. [Dkt 36-7 at 38 (Davis Tr. 147:4-10, 148:15-22)]. Gordon described Wasden as a smart, *young* individual who was ready to move up the ladder – implying that Wasden should replace Davis. [Dkt 36-7 at 33 (Davis Tr. 139:15-140:10).[17] Gordon documented his discriminatory animus based on Davis' disability in memo to Breeze, listing "health concerns and restrictions" as one of Davis' "weaknesses." [Dkt 35-4 at 39-42], [Dkt 36-19 at 13 (Gordon Tr. 60:2-8)].

---

[16] Gordon clearly regarded Davis as disabled, listing "health concerns" and "restrictions" as his "weaknesses" in evaluating his job performance. [Dkt 35-4 at 39-42]; 29 C.F.R. 1630.2(g)(1)(iii)).

[17] Medxcel did, in fact, replace Davis with Wasden. Shortly after his termination, Lovelace told Davis that Wasden had already taken over Davis' former role and office. [Dkt 36-7 at 57 (Davis Tr. 214:9-19)]. Wasden was known by hospital staff as the "team lead," and replaced Davis by attending daily huddles with department representatives. [Dkt 36-14 (T. Davis Aff. ¶ 9)]; [Dkt 36-8(Cable Aff. ¶ 9)].

Gordon testified that his "health concerns" about Davis included Davis' stress level, and that Davis had recently had a stent put in. [Dkt 36-19 at 13 (Gordon Tr. 60:9-17)]. Gordon clearly understood – after researching "stent" on his cell phone – that stress affected Davis' medical condition. [Dkt 36-19 at 13-14 (Gordon Tr. 60:17-61:8)]. Gordon confirmed that "restrictions" referred to Davis' lifting restriction. [Dkt 36-19 at 14 (Gordon Tr. 61:18-22)]. Gordon conceded that not many supervisor tasks involve lifting more than 25 pounds.[18] [Dkt 36-19 at 15 (Gordon Tr. 63:11-15)]. Davis is the only employee for whom Gordon listed "health concerns" or "restrictions" as a weakness. [Dkt 35-4 at 39-42].

Gordon first asked Davis when he was going to retire in late June, 2016, saying, "You're thinking about retiring pretty soon, aren't you?" [Dkt 35-2 at 78 (Davis Tr. 172:9-16)].Davis said he would like to retire when he was 66, and had four more years to go. [Dkt 35-2 at 78 (Davis Tr. 172:22-25)]. Shortly thereafter, on July 7, 2016, while presenting Davis with a Final Warning, Gordon said, sarcastically, "I know that you talked about retiring, but we really want to – I really want you to stay here until you're in your 80s." [Dkt 35-2 at 101 (Davis Tr. 207:11-21)]. Medxcel stretches to call this an "admission" that Gordon wanted Davis to remain employed rather than retire. [Dkt 34 at 20]. However, Davis interpreted this comment to be sarcastic, and Gordon admitted that Davis was still years away from retirement when he made this comment, so retirement had no relevance to the conversation about the Final Written Warning. [Dkt 35-4 at 30 (Gordon Tr. 117:13-17)].

---

[18] Breeze and Gordon have conflicting testimony on this point. Gordon testified that Davis' lifting restriction was a concern because Medxcel was considering putting Davis in a position in which he would have been by himself at some times, and there is "no telling what he could have done out there." [Dkt 36-19 at 15-16 (Gordon Tr. 63:16-64:24)]. In other words, Gordon did not trust Davis to follow his doctor's lifting restrictions. *Id.* However, Breeze testified that he asked Gordon to create the memo merely as an academic exercise to get to know his employees, and that at the time the memo was created, Medxcel was not considering removing Davis from the supervisor role, but that Gordon was advocating for that type of change. [Dkt 36-18 at 14, 16 (Breeze Tr. 49:4-15, 51:17-24)].

Two weeks later, Gordon decided to terminate Davis. [Dkt 36-4]. When asked, Gordon could not identify any specific event that occurred in the two weeks after the Final Warning which would give rise to a legitimate, non-discriminatory reason to terminate Davis. [Dkt 36-19 at 22-23 (Gordon Tr. 93:25-94:18)]. Gordon's comments about Davis' age are not the type of "stray remarks" contemplated by *Schaffner v. Glencoe Park Dist.*, 256 F.3d 616, 622-23. Gordon only supervised Davis for about eight weeks, and at least one of the comments was made during the meeting in which Davis was given the final warning before his termination. [Dkt 35-2 at 101 (Davis Tr. 207:11-21)]. Moreover, the memo in which Gordon advocated that Davis be removed from his role as supervisor specifically mentioned Davis' disability. [Dkt 35-4 at 39-42]; [Dkt 36-18 at 16 (Breeze Tr. 51:17-24)]. Based on Gordon's comments alone, which were all made by the decision-maker, within in the eight weeks leading up to Davis' termination (one while delivering the Final Warning), a reasonable jury could conclude that Davis was terminated because of his age and/or disability.

### 2. The disciplinary action was a pretext for unlawful discrimination.

"In some cases, however, the issue of meeting legitimate job expectations and the question of pretext overlap. This is particularly true when the employer asserts as the nondiscriminatory reason for termination that an employee was not meeting legitimate job expectations." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 463 (7th Cir. 2014) (citations omitted). Where an employer cites performance issues as the justification for its adverse action, the analysis must begin with pretext. *Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013). If a jury could find that Medxcel held Davis to different standards than younger employees without a disability, then Medxcel would not be able to plausibly assert that Davis' failure to meet those standards were a non-pretexual reason for firing him. *Simpson v.*

*Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016) ("If a jury could find that [defendant] applied its rules disparately, then the defendant would not be able to plausibly assert that its application of those same rules was a non-pretextual reason for firing [plaintiff].").

Medxcel cites to "performance issues" as justifying Davis' termination. [Dkt 34 at 24]. However, it is clear that once Gordon became his supervisor, Davis was held to unreasonable performance standards, and his disciplinary actions and termination were a pretext for discrimination. For example, under his initial PDP, Davis and Callis agreed that daily rounding of the 300,000 square foot hospital was not feasible, and Callis changed the expectations from "daily" rounding of the entire Hospital to "weekly" rounding of one quarter of the Hospital. [Dkt 36-7 at 25-26 (Davis Tr. 122:17-123:170]; [Dkt 35-2 at 121-23]. But Gordon immediately instructed Davis to complete daily EOC rounding of the 300,000 square foot facility, where his younger employees were doing daily rounding of a 65,000 square foot building. [Dkt 35-2 at 63 (Davis Tr. 133:7-21)]. Gordon even said, "I've got younger people over at Seton Specialty that could come over and do the job if you can't." *Id.* When Davis rose to the challenge and gave Gordon paperwork showing that he had completed all of his rounds as asked, Gordon threw the papers in the trash. [Dkt 36-7 at 32-33 (Davis Tr. 138:16-139:6)]. Gordon held his younger subordinates to different performance standards, and the performance issues cited were merely a pretext for unlawful discrimination.

The only other performance issues Medxcel points to are "unprofessional or rude" communications with co-workers and Women's Hospital employees. [Dkt 34 at 27]. Medxcel relies on an email in which Davis used the word "crap," [Dkt 35-5 at 6, 11-15 (Callis Aff. ¶ 22, Ex. A)], the fact Davis jokingly told Jill Lancaster, a hospital employee and friend, to "take a chill pill," [Dkt 35-8 at 6-7, 11 (Lancaster Tr. 14:19-15:6, 30:5-8)], Gordon's testimony that

Davis was "really short" with an unnamed kitchen staff, saying he was "not sure what was going on" with a work order [Dkt 35-4 at 14 (Gordon Tr. 68:10-21)], Gordon's testimony that Davis said to an unnamed painting manager, "Don't hold your breath," and Davis' own testimony that a vendor (who was a friend of Gordon's) told Gordon that Davis had "threatened" him. [Dkt 35-4 at 22 (Gordon Tr. 100:17-22)]. However, Callis counseled Davis on his written communications, and there is no evidence that Davis had a single written communication issue after that. Lancaster testified that the "chill pill" comment was probably intended as a joke. [Dkt 35-8 at 7(Lancaster Tr. 15:14-19)]. Lancaster did not report the comment, and did not feel it was a sufficient reason for Davis to be terminated. [Dkt 35-8 at 8 (Lancaster Tr. 18:1-3)], [Dkt 36-15 at 5 (Lancaster Tr. 20:20-24)].[19] The remaining three statements are inadmissible hearsay, because Gordon and Davis did not actually witness the statements. See *Bagwe v. Sedgwick Claims Mgmt. Servs.*, 811 F.3d 866, 883 (7th Cir. 2016).

During the eight weeks as Davis' supervisor, Gordon made no effort to get to know Davis and evaluate him objectively on his performance. Gordon even told Davis, "I've already talked to Jason all about you, and I know everything I need to know." [Dkt 36-7 at 70 (Davis Tr. 251:11-18)]. Gordon became Davis' supervisor on May 23, 2016, and the PDP created by Callis expired on May 29, 2016. [Dkt 36-19 at 25 (Gordon Tr. 97:17-22)]; [Dkt 35-2 at 121-123]. Instead of reviewing Davis' progress under the prior PDP, Gordon pushed to make Davis a regular technician, and replace him with a younger individual as a "team lead." (Gordon Tr.

---

[19] Medxcel points to one incident where a sewer pipe burst, and Jill Lancaster repeatedly asked what type of water was in the pipe while Davis and the other facilities technicians were trying to figure it out. [Dkt 34 at 16]. Lancaster appeared very upset, and Davis nicely patted her on the back and said, "Jill, take a chill pill." [Dkt 36-7at 58-59 (Davis Tr. 233:23-234:9)]. Lancaster testified that she and Davis were friends and would joke around, and that the comment was probably intended as a joke. [Dkt 35-8 at 8 (Lancaster Tr. 18: 14-19; Dkt 36-15 at 6 (Lancaster Tr. 22:10-19)]. Lancaster did not report the comment, and would rather have addressed it privately with Davis. [Dkt 35-8 at 8 (Lancaster Tr. 18:1-3)]. Lancaster did not feel that the comment was a sufficient reason for Davis to be terminated. [Dkt 36-15 at 5 (Lancaster Tr. 20:20-24)]. The comment was not mentioned specifically at Davis' termination, and was only raised *after* Davis' termination, by Matthews. [Dkt 36-7 at 59 (Davis Tr. 234:10-13); Dkt 35-2 at 135].

84:2-8; [Dkt 35-4 at 39-42]. When Davis "screwed up" that plan, Gordon gave Davis a final

warning and initiated the steps for his termination. [Dkt 35-2 at 82 (Davis Tr. 178:3-21); Dkt 36-

3]. However, Gordon admitted that, as of July 7, 2016, when Gordon gave Davis both his annual

review and final warning, he did not have sufficient time to accurately evaluate Davis on his

performance. [Dkt 36-19 at 18 (Gordon Tr. 87:17-23)]. Gordon decided to terminate Davis on or

before July 21, 2016 [Dkt 36-3]; [Dkt 36-19 at 23-24 (Gordon Tr. 94:19-95:8)], despite the fact

that the final warning set out an improvement plan for the entire month of July, 2016. [Dkt 36-3];

[Dkt 36-19 at 21 (Gordon Tr. 92:3-6)].

"In determining whether an employer's stated reason [for discharge] is pretextual, the

question is not whether the employer's stated reason was inaccurate or unfair, but whether the

employer honestly believed the reason it has offered to explain the discharge." *Harper v. C.R.*

*England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012). Gordon, the decision-maker, admitted that, as

of July 7, 2016, he did not feel he had sufficient time to accurately evaluate Davis' performance.

[Dkt 36-3]; [Dkt 36-19 at 18, 23-24 (Gordon Tr. 87:17-23, 94:19-95:8)]. Breeze admitted that he

simply accepted Gordon's assessment at face value. [Dkt 36-18 at 19 (Breeze Tr. 55:8-14)].

These admissions alone preclude summary judgment for Medxcel. The accelerated timeline on

which Gordon terminated Davis, coupled with Gordon's admission that he could not accurately

evaluate Davis' performance, is sufficient to create a material issue of fact for a jury to decide on

the issue of pretext.

### C.    Gordon created a hostile work environment because of age and disability.

The Seventh Circuit has assumed, without deciding, that plaintiffs may bring hostile

environment claims under the ADEA and ADA. *Bennington v. Caterpillar Inc.*, 275 F.3d 654,

660 (7th Cir. 2001); *Holyfield-Cooper v. Bd. of Educ. of Chi.*, 604 F. App'x 504, 508 (7th Cir.

2015). Davis can survive summary judgment by presenting evidence sufficient for a reasonable jury to find that "(1) the environment was both subjectively and objectively offensive; (2) the harassment he suffered was based on his membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Poullard v. McDonald*, 829 F.3d 844, 859 (7th Cir. 2016). Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993)).

Gordon took advantage of the fact that Davis does not handle stress well by harassing and provoking Davis, trying to coax him into saying something wrong. [Dkt 36-7 at 71 (Davis Tr. 252:19-24)]. Daily, Gordon pulled up a chair behind Davis' desk, physically cornering him so that Davis had no room to move. [Dkt 35-2 at 63 (Davis Tr. 133:7-21)]. Gordon held Davis to unreasonable standards, and when Davis objected, Gordon said, "I don't need this pushback. I've got younger people over at Seton Specialty that could come over and do the job if you can't." [Dkt 35-2 at 63-64 (Davis Tr. 133:7-134:11)]. When Davis worked long hours (without overtime pay) to meet those standards, Gordon abruptly threw the completed work in the trash. (Davis Tr. 138:16-139:6, 152:9-14). Gordon constantly belittled Davis in front of his coworkers, but praised his *younger* employee. [Dkt 36-7 at 39 (Davis Tr. 148:15-22)]. Gordon's daily greeting, "O' Paul Davis," was subjectively offensive to Davis. [Dkt 36-7 at 33 (Davis Tr. 139:15-22); Dkt 35-2 at 68, (Davis Tr. 147:6-12)]. Gordon intentionally induced stress in the hope that Davis would step down as supervisor or retire, and even advocated to Breeze that Davis should become a general maintenance technician, and his younger employee Wasden should become the team leader. [Dkt

35-4 at 39-42]; [Dkt 36-18 at 16 (Breeze Tr. 51:17-24)]. When Davis opted not to step down, Gordon said Davis "screwed up" his plans, and quickly moved to terminate Davis, issuing a final warning that added eight to ten extra duties to Davis' already overflowing plate. [Dkt 35-2 at 82 (Davis Tr. 178:3-21)], [Dkt 36-7 at 69 (Davis Tr. 250:4-10)].

Gordon's verbal and physical actions are both subjectively and objectively offensive and outrageous. The stress created by Gordon was so severe that Davis began to have "flare ups" of his heart condition almost every day. [Dkt 36-7 at 44-45 (Davis Tr. 164:19-165:7)]. Davis even asked Gordon if Medxcel had any programs to help him deal with the stress. [Dkt 36-19 at 22 (Gordon Tr. 93:4-10)]. The harassment began as soon as Gordon became Davis' supervisor, and continued through his termination, when Gordon threatened, "are you going to take the high road, or do we need to go out the back door?" [Dkt 35-2 at 104 (Davis Tr. 211:6-13)]; [Dkt 36-7 at 63-64 (Davis Tr. 243:24-244:2)]. Gordon clearly intended to exploit Davis' disability. Many of the discriminatory and sarcastic comments were directly related to Davis' age. Gordon knew that Davis had trouble handling stress, which highlights the willfulness of his egregious behavior.

## IV.    CONCLUSION

For the foregoing reasons, Davis respectfully requests that this Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

/s/ Kathleen A. DeLaney
Kathleen A. DeLaney (#18604-49)
Annavieve C. Conklin (#33875-32)
*Attorneys for Plaintiff Paul Davis*

DeLaney & DeLaney LLC
3646 N. Washington Blvd.
Indianapolis, IN 46205

35

Tel. 317.920.0400
Fax 317.920.0404
Kathleen@delaneylaw.net
aconklin@delaneylaw.net

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of April, 2018, a copy of the foregoing was filed electronically. Notice of this Filing will be sent to the following parties by operation of the Court's electronic Filing system. Parties may access this Filing through the Court's CMECF system.

Alan L. McLaughlin
Emily L. Connor
amclaughlin@littler.com
econnor@littler.com


/s/ Kathleen A. DeLaney
Kathleen A. DeLaney

DELANEY & DELANEY LLC
3646 N. Washington Blvd.
Indianapolis, IN 46205