UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PAUL DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-00790-JPH-MJD |
| | ) | |
| MEDXCEL FACILITIES MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING MEDXCEL'S MOTION FOR SUMMARY JUDGMENT**

Paul Davis was the Facilities Supervisor at St. Vincent's Women's

Hospital. After his employment was transferred from St. Vincent's to MedXcel

Facilities Management, Mr. Davis was reclassified from an hourly, non-exempt

employee to a salaried, exempt employee, put on a performance development

plan, and terminated several months later. Mr. Davis alleges that he was

improperly denied overtime wages as a result of the reclassification and that

MedXcel terminated his employment because of his age and disability.

Because the designated evidence shows that there are triable issues of material

fact, MedXcel's motion for summary judgment is **DENIED**. Dkt. [33].

**I.**

Because MedXcel has moved for summary judgment under Rule 56(a),

the Court views and recites the evidence "in the light most favorable to the non-

moving party and draw[s] all reasonable inferences in that party's favor."

*Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

**A. Employment Background and Job Duties**

St. Vincent Women's Hospital hired Mr. Davis as a Facilities Mechanic in 2006 and promoted him to Facilities Supervisor in 2013. Dkt. 35-2 at 5 (Davis Dep. 18:1–17). Mr. Davis was the only Facilities Supervisor at the Women's Hospital. *Id.* at 8 (23:10–13).

Mr. Davis was diagnosed with congestive heart failure in 2008; he experienced a heart attack and had open heart surgery. *Id.* at 71 (158:11–15). Between 2007 and 2016, Mr. Davis had five stents and a pacemaker placed. *Id.* at 73 (160:1–14). His most recent stent surgery was in June 2016. *Id.* (160:21–24).

In 2008, Mr. Davis was placed on a 25-pound lifting restriction, related to his heart condition. *Id.* (160:16–17). MedXcel honored his lifting restriction. Dkt. 35-5 at 9 (Callis Decl. ¶ 35); dkt. 36-19 at 41–42 (Gordon Dep. 41:21–42:1); dkt. 36-7 at 46 (Davis Dep. 169:3–9).

In 2015, the Women's Hospital outsourced facilities maintenance to MedXcel so Mr. Davis became an employee of MedXcel. Dkt. 35-1 (Waller Decl. ¶ 4); dkt. 36-7 at 10 (Davis Dep. 18:21–25). Mr. Davis retained his position as Facilities Supervisor and continued to be paid as an hourly, non-exempt employee. Dkt. 35-2 at 5 (Davis Dep. 18:18–25); *id.* at 35 (80:22–81:1).

At the time Mr. Davis' employment transferred to MedXcel, two facilities technicians reported to him. *Id.* at 16 (32:13–21). Mr. Davis' duties and responsibilities included approving paid time off and purchase order requests,

overseeing vendors and contractors, *id.* at 26 (59:4–11), and participating in interviews and some termination decisions, *id.* at 24–25 (51:24–52:17).

On November 4, 2015, MedXcel reclassified Mr. Davis from an hourly, non-exempt employee, to a salaried, exempt employee. *Id.* at 39 (85:16–18); dkt. 35-1 at 2–3 (Waller Decl. ¶ 6). From the date of the reclassification until Mr. Davis' termination in July 2016, MedXcel did not pay Mr. Davis any overtime wages. Dkt. 36-7 at 61 (Davis Dep. 241:8–10).

## B. Disciplinary Warnings and the March 2016 Performance Development Plan

In December 2015, Mr. Davis received a written disciplinary notice for discourtesy or verbal abuse of guests and other associates because he used the word "crap" in an email to another associate. Dkt. 35-2 at 116–19 (Davis Dep., Ex. 5). The Notice also listed two other incidents, including a water main break where Mr. Davis failed to timely communicate with his supervisor, and the shutdown of an operating air handling unit, where Mr. Davis failed to properly investigate. *Id.* at 48–50 (102:4–103:8; 103:20–104:22).

On March 30, 2016, Eric Waller, District Regional Director, noticed mismatched ceiling tiles in the Women's Hospital and told Mr. Davis that he should be fired. *Id.* at 52–53 (106:18–107:4). That same day, Mr. Davis was placed on a performance development plan ("PDP"). *Id.* at 43–44 (93:21–94:2); 121–23 (Ex. 6). The PDP outlined various performance issues, including: (1) escalating issues appropriately; (2) challenges with staff management;

(3) communication with staff, peers, and customers; and (4) management of work orders and record keeping.  *Id.* at 121–23 (Ex. 6).

Mr. Davis completed part of the first PDP, and Zach Matthews, a Human Resources Representative, told him that he was doing an excellent job.  *Id.* at 56 (110:7–9).

### C. Kenneth Gordon becomes Mr. Davis' manager

In May 2016, Kenneth Gordon became Mr. Davis's manager.  Dkt. 36-7 at 27 (Davis Dep. 130:9–11); *id.* at 30 (136:4–6).  Mr. Gordon regularly greeted Mr. Davis as "O' Paul Davis."  *Id.* at 63 (243:6–9).

Under Mr. Gordon's management, Mr. Davis was responsible for completing work orders and ensuring preventative maintenance orders were completed. Dkt. 36-19 at 10 (Gordon Dep. 46:3–8).  Mr. Gordon required Mr. Davis to complete daily rounding of the 300,000 square foot building while younger employees were only required to complete daily rounding of a 65,000 square foot building.  Dkt. 35-2 at 63–64 (Davis Dep. 133:13–134:9).  When Mr. Davis objected to completing the daily rounding, Mr. Gordon stated that he did not need pushback and that he had younger people over at another facility that could do the job.  *Id.* at 64 (134:7–9).  One time, when Mr. Davis gave Mr. Gordon paperwork showing that he completed daily rounds for one week, Mr. Gordon threw it in the trashcan.  Dkt. 36-7 at 32–33 (Davis Dep. 138:18–139:4).

In late June 2016, Mr. Gordon asked Mr. Davis whether he would be retiring soon.  Dkt. 35-2 at 78 (Davis Dep. 172:10–21).  Mr. Davis responded

that he would retire when he was sixty-six, four years in the future, and Mr. Gordon did not reply. *Id.* at 78–79 (172:23–173:4).

### D. Mr. Davis' Decision to Remain as Facilities Supervisor

On June 22, 2016, Mr. Davis met with Mr. Gordon and Mitchell Breeze, Mr. Gordon's supervisor, to discuss changing roles and stepping down as Facilities Supervisor. *Id.* at 81 (176:11–178:5). Mr. Breeze informed Mr. Davis that he would have to come up with different options for other roles. Dkt. 36-7 at 48–49 (Davis Dep. 177:23–178:1). Daniel Lovelace, another employee, told Mr. Davis that Mr. Gordon wanted Mr. Davis to step down as supervisor. *Id.* at 49 (178:3–12). Shortly after the meeting, Mr. Davis told Mr. Gordon that he did not want to step down and that he wanted to keep his role as Facilities Supervisor. *Id.* (178:13–16). A day or two later, Mr. Gordon told Mr. Davis that he spoke with Mr. Breeze and that Mr. Davis "screwed up all the plans." *Id.* (178:17–21).

### E. Mr. Gordon's evaluation of his staff

On June 23, 2016, Mr. Gordon emailed Mr. Breeze a memorandum outlining the strengths and weaknesses of his staff and listed "health concerns and restrictions" as one of Mr. Davis' weaknesses. Dkt. 35-4 at 39–41. Mr. Davis was the only employee that had "health concerns and restrictions" listed as a weakness. *See id.*

## F. Mr. Davis' Second Professional Development Plan, Annual Review, and Final Warning

On July 7, 2016, Mr. Gordon met with Mr. Davis and told him that he wanted Mr. Davis to stay with MedXcel until he was in his 80's. Dkt. 35-2 at 101 (Davis Dep. 207:15–18).

During the same meeting, Mr. Gordon placed Mr. Davis on his second PDP, which was considered a final warning, *id.* at 124–27 (Ex. 8), and gave Mr. Davis his annual review, dkt. 35-4 at 19 (Gordon Dep. 89:19–25). Mr. Davis received an overall rating of 2.17, or "achieves most position standards" on his annual review. Dkt. 35-2 at 128–34 (Davis Dep., Ex. 9). The second PDP noted the previous warnings listed in the first PDP. *Id.* at 124–27 (Ex. 8). It also noted that Mr. Davis' past performance as a supervisor, as well as his management of stress levels with leadership, vendors, and staff, had a negative impact on MedXcel. *Id.* The second PDP listed twenty different duties that Mr. Davis was expected to perform. *Id.* The second PDP was intended to be in effect for the entire month of July. Dkt. 36-3.

## G. Mr. Davis' Termination

On July 21, 2016, Mr. Gordon emailed Mr. Breeze and Mr. Matthews, requesting to terminate Mr. Davis. Dkt. 36-4. Five days later, Mr. Gordon, Mr. Breeze, and Mr. Matthews met with Mr. Davis and terminated his employment. Dkt. 35-2 at 102–03 (Davis Dep. 208:23–209:14). During the meeting, Mr. Gordon provided Mr. Davis with a copy of the "Employee Termination Request," which specified five performance issues that led to his termination:

1. EOC rounds incomplete per development plan.
2. Incomplete inspections of construction areas.
3. Discourtesy and negative conversations with hospital leadership during building and maintenance concerns and issues.
4. Negative conversations with hospital staff and management over information gathered for work orders within hospital.
5. Negative conversations, reactions, and unable to maintain stress levels with faculties manager pertaining to supervisor job expectations and performance plan.

*Id.* at 135 (Ex. 10).

The complaint brings four claims against MedXcel: discrimination based on age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* (Count I); discrimination based on disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* (Count II); violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* (Count III); and violation of the Indiana Wage Claims Statute ("IWCS"), Indiana Code § 22-2-9-1, *et seq.* (Count IV).

MedXcel moves for summary judgment on all claims. Dkt. 33. For the reasons that follow, MedXcel's motion is **DENIED**.

## II.

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this

burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

## III.

Mr. Davis alleges that MedXcel unlawfully terminated him because of his age and disability, and wrongly denied him overtime pay.

### A. Age Discrimination (Count I)

The ADEA prohibits an employer from, among other things, terminating a protected individual's employment based on age. 29 U.S.C. §§ 623(a); 631(a); *see Carson v. Lake Cty.*, 865 F.3d 526, 532 (7th Cir. 2017). To prevail on an ADEA claim, a plaintiff must "prove, by a preponderance of the evidence, that age was the 'but-for' cause of adverse employment action." *Carson*, 865 F.3d at (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177 (2009)); *see also Lauth v. Covance, Inc.*, 863 F.3d 708, 715 (7th Cir. 2017) (the proper inquiry is whether a reasonable jury could determine, based on all of the record evidence, that the employee's age was the cause of his termination); *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016). Evidence that discrimination was a "motivating factor" is insufficient; at the summary judgment stage, a plaintiff must offer evidence that could support a jury verdict that age was a "but-for cause" of the employment action. *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598,

603 (7th Cir. 2012) (citing *Gross*, 557 U.S. at 176)).  That can be done either with "evidence that [his] employer took an adverse action against [his] because of [his] age," or through the *McDonnell Douglas* burden-shifting framework. *Id.* at 533 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

MedXcel argues that it terminated Mr. Davis' employment for legitimate reasons after repeatedly counseling him for performance deficiencies over the course of eighteen months without observing any meaningful improvement. Dkt. 34 at 18.  Mr. Davis argues that a reasonable jury could find from Mr. Gordon's comments that his age was the reason he was terminated and the reasons MedXcel gave for terminating him were pretextual.  Dkt. 37 at 28–33.

Mr. Davis identifies the following comments made by Mr. Gordon as evidence of age animus: (1) referring to Mr. Davis as "O' Paul Davis," dkt. 36-7 at 63 (Davis Dep. 243:6–9); (2) stating "I've got younger people over at Seton Specialty that could come over and do the job if you can't," dkt. 35-2 at 64 (Davis Dep. 134:7–9); (3) asking Mr. Davis if he was planning on retiring soon, *id.* at 78 (172:9–173:4); (4) stating that another employee would be a supervisor soon because he was a "smart, young individual and had all the talent," dkt. 36-7 at 34 (140:5–10); and (5) when giving Mr. Davis his final warning, stating, "I know that you talked about retiring, but we really want to–I really want you to stay here until you're in your 80's," dkt. 35-2 at 101 (Davis Dep. 207:15–18). *See* dkt. 37 at 28–29.  These comments are alleged to have all been made between May 2016 when Mr. Gordon became Mr. Davis' supervisor and the end of July 2016 when Mr. Davis was terminated.

MedXcel dismisses Mr. Gordon's alleged comments as isolated or stray remarks, insufficient to support a finding of age discrimination. Dkt. 34 at 18–23. MedXcel further asserts that Mr. Gordon regularly greeted people with the salutation "O" so that's not evidence of discrimination. Dkt. 35-4 at 31 (Gordon Dep. 118:20–23). Additionally, Mr. Gordon denied making the statement about younger people doing Mr. Davis' job. *Id.* at 35 (122:9–11). Lastly, Mr. Gordon testified that he "probably" did not ask Mr. Davis about retiring at the same meeting he gave Mr. Davis the final warning. *Id.* at 30 (117:18–20).

Mr. Davis has designated evidence from which a reasonable jury could find that age was the "but-for" cause of his termination. Mr. Gordon's comment about Mr. Davis working until he was in his 80's was made during the same meeting where he placed Mr. Davis on his second PDP and gave him a final warning. The comment is probative of age discrimination because it was temporally and causally related to the termination and made by a decision-maker. *See Fleishman*, 698 F.3d at 605. The 80's remark was temporally related or "contemporaneous with" the termination because it was made only two weeks prior to Mr. Davis' termination. *See Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999) (at the time of termination was contemporaneous); *Weller v. Life Care Ctrs. of Am.*, 1:04-cv-1977-RLY-WTL, 2006 WL 2193079, at *6 (S.D. Ind. 2006) (one week prior to termination was contemporaneous).

The remark was also causally related because it was made during the meeting where Mr. Gordon gave Mr. Davis a final warning. *See Sheehan*, 173 F.3d at 1044–45 (remark causally related because it was made at the time of termination). Finally, the remark was made by Mr. Gordon, the person who recommended and participated in Mr. Davis' termination.

MedXcel argues that Mr. Gordon's comment about Mr. Davis working until he was in his 80s undermines Mr. Davis' contention that Mr. Gordon wanted him to retire due to his age and defeats any contention that Mr. Gordon harbored animosity towards older workers in general. Dkt. 34 at 20. Viewed in a light most favorable to Mr. Davis, however, it is reasonable to infer that this comment was sarcastic and thus could be construed as evidence of discrimination. Mr. Gordon told Mr. Davis that he should not retire during a disciplinary meeting. The comment was not made in a casual or complimentary conversation. *See Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) (remark not causally related because it was made a casual conversation during a long car trip, a setting unrelated to discussions of the plaintiff's repeated work deficiencies).

MedXcel argues that even if Mr. Gordon had suggested that Mr. Davis retire, "suggestion[s] of retirement do[] not rise to the level of direct evidence of age discrimination' when there is an alternative explanation for the employment action." Dkt. 34 at 20 (citing *Fleishman*, 698 F.3d at 606 (quotations omitted)). MedXcel asserts that it terminated Mr. Davis' employment after repeatedly counseling him for performance deficiencies over

11

the course of 18 months without any meaningful improvement. *Id.* at 18. Mr. Davis signed the second PDP, acknowledging that failure to correct any performance issues noted could result in termination. Dkt. 35-2 at 126. After placing Mr. Davis on the second PDP, MedXcel received two complaints about Mr. Davis. Dkt. 35-3 at 4–5 (Matthews Decl. ¶ 16). One employee reported to Mr. Gordon that Mr. Davis had told another employee, Jill Lancaster, to take a "chill pill" following a sewage pipe leak. Dkt. 35–4 at 15 (Gordon Dep., 69:10–13); dkt. 35-8 at 5 (Lancaster Dep. 13:4–8). Another employee reported that Mr. Davis informed a nurse manager that the work orders she had requested were not important and would not get done. Dkt. 35-3 at 4–5 (Matthews Decl. ¶ 16).

But Mr. Davis has designated evidence that call MedXcel's stated reasons for his termination into question. *See Teruggi v. CIT Grp.*, 709 F.3d 654, 660 (7th Cir. 2013) (circumstantial evidence includes evidence that the employer offered a pretextual reason for an adverse employment action). Mr. Gordon testified that he did not feel he had been Mr. Davis' supervisor for enough time to accurately evaluate Mr. Davis' performance. Dkt. 36-19 at 18 (Gordon Dep. 87:21–23). Mr. Gordon also initiated termination proceedings on July 21, 2016, dkt. 36-4, when the final warning set out an improvement plan for the entire month of July 2016, dkt. 36-3. Finally, Mr. Gordon did not explain why he chose to initiate Mr. Davis' termination when he did. Dkt. 36-19 at 23 (Gordon Dep. 94:2–18).

While a suggestion of retirement by itself does not necessarily indicate age discrimination, the evidence must be viewed as a whole. Here, a reasonable juror could conclude from all of the evidence that MedXcel terminated Mr. Davis' employment because of his age.[1] *Ortiz*, 834 F.3d at 765. Or it could conclude the termination was for legitimate reasons. But these conclusions depend on resolving disputed facts and making credibility determinations so MedXcel's motion for summary judgment on Mr. Davis' ADEA claim (Count I) is **DENIED**.

## B. Disability Discrimination (Count II)

The ADA prohibits an employer from discriminating against a "qualified individual" based on his disability. 42 U.S.C. § 12112(a); *Monroe v. Ind. DOT*, 871 F.3d 495, 503 (7th Cir. 2017). To prevail on an ADA claim, a plaintiff "must show that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability." *Monroe*, 871 F.3d at 504 (quoting *Roberts v. City of Chicago,* 817 F.3d 561, 565 (7th Cir. 2016)). To avoid summary judgment, a plaintiff is not required to establish a prima facie case of discrimination under the *McDonnell Douglas* burden shifting framework. While that is one way to do it, ultimately a plaintiff's burden is to designate evidence that, when considered as a whole, would permit a reasonable jury to find that the employee's disability was the cause of his

---

[1] Because a triable issue of material fact exists as to whether Mr. Davis was terminated because of his age, there is no need to analyze Mr. Gordon's other comments.

termination.  *See A.H. v. Ill. High Sch. Ass'n*, 881 F.3d 587, 593 (7th Cir. 2018)

("the ADA requires proof of causation"); *see also Scheidler v. Indiana*, 914 F.3d

535, 541 (7th Cir. 2019) ("disability was the 'but for' cause of adverse

employment action").

The parties do not appear to dispute the first element—Mr. Davis is

disabled under the ADA—or the third element—he was otherwise qualified to

perform the essential functions of the job with or without reasonable

accommodation.[2]  So the question is whether Mr. Davis has designated

evidence from which a jury could reasonably infer that he was terminated

because of his disability.

MedXcel argues that it terminated Mr. Davis for his ongoing poor

performance.  Dkt. 34 at 26.  MedXcel contends that it demonstrated its good

faith and lack of discriminatory animus by honoring Mr. Davis' verbal request

for a lifting restriction.  *Id.*

Mr. Davis argues that even though MedXcel honored his lifting

restriction, Mr. Gordon's memorandum identifying "health concerns and

restrictions" as one of Mr. Davis' weaknesses is evidence of disability animus.

Dkt. 37 at 29.  Mr. Davis was the only employee that had "health concerns and

---

[2] MedXcel argues that, to the extent Mr. Davis is claiming MedXcel discriminated against him as a result of some alleged medical condition related to stress, the evidence shows that Mr. Davis never sought an accommodation related to stress and did not mention stress to anyone as a medical condition.  Dkt. 34 at 27–28.  Mr. Davis did not respond to MedXcel's arguments.  *See* dkt. 37.  Accordingly, the Court's analysis focuses on whether MedXcel terminated Mr. Davis based on his heart condition and lifting restriction. *See Roe-Midgett v. CC Servs.*, 512 F.3d 865, 876 (7th Cir. 2008) (undeveloped argument constitutes waiver).

restrictions" listed as a weakness. *See* dkt. 35-4 at 39–41. Mr. Gordon knew that Mr. Davis had a stent put in between May and June 2016, dkt. 36-19 at 60 (60:14–22), and testified that when he wrote "restrictions," he was referring to Mr. Davis' lifting conditions, *id.* at 61 (61:19–22). Mr. Breeze testified that the memorandum was an "academic exercise" and that, at the time it was created, MedXcel was not considering removing Mr. Davis from a supervisory role but Mr. Gordon was advocating for a change like that. Dkt. 36-18 at 14 (49:9–11); *id.* at 16 (51:17–24).

MedXcel contends that Mr. Gordon's deposition testimony about the memorandum belies any discriminatory animus. Dkt. 34 at 26–27. MedXcel argues that "Mr. Gordon testified that he was worried about Davis's informally accommodated lifting restriction in light of Davis's request to step down from a supervisor position into a plumber position and that if Davis stepped down into a technician role, it would be more likely he could violate the lifting restriction." *Id.*; dkt. 36-19 at 62 (Gordon Dep. 18–22). But this is contradicted by Mr. Breeze's testimony that the memorandum was unrelated to discussions regarding whether Mr. Davis would step down as supervisor. Dkt. 36-18 at 48 (Breeze Dep. 49:12–15).

A jury could determine from the designated evidence that Mr. Davis was terminated because of his disability. While MedXcel's history of accommodating Mr. Davis' lifting restriction is one relevant fact properly considered, it is not dispositive as to discriminatory intent. *See Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 398 (7th Cir. 2000). Mr. Gordon's remark about Mr. Davis'

weaknesses as an employee is probative of disability discrimination because it was temporally related, causally related, and made by a decision-maker. *See Kennedy v. Schoenberg, Fisher & Newman*, 140 F.3d 716, 723–24 (7th Cir. 1998)

The remark was temporally related because it was made two weeks prior to Mr. Gordon placing Mr. Davis on his second PDP and around one month prior to Mr. Davis' termination. The remark was also causally related because the memorandum evaluated Mr. Davis' strengths and weaknesses as an employee and was sent to Mr. Breeze. Discussions at work regarding an employee's performance deficiencies are causally related. *See Kennedy*, 140 F.3d at 724; *Geier*, 99 F.3d at 242. Lastly, as discussed above, Mr. Gordon had a direct role in Mr. Davis' termination.

A jury could reasonably infer from the evidence that Mr. Davis' disability was the reason for his termination. Or it could conclude the termination was for legitimate reasons. But these conclusions depend on resolving disputed facts and making credibility determinations so MedXcel's motion for summary judgment on Count II is **DENIED**.

### C. Overtime Wages (Counts III and IV)

The FLSA requires employers to compensate employees who work over forty hours per workweek "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The overtime provision does not apply, however, when the employee is "employed in a bona

fide executive…capacity…" 29 U.S.C. § 213(a)(1). An employee is employed in

a bona fide executive capacity when the employee is:

> (1) Compensated on a salary basis at a rate of not less than $455[3] per week…, exclusive of board, lodging or other facilities;

> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

> (3) Who customarily and regularly directs the work of two or more other employees; and

> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a) (effective until December 1, 2016).

The parties do not dispute the first factor or whether Mr. Davis worked in

a customarily recognized department, so the Court focuses on whether his

primary duties were managerial, and factors (3) and (4). In evaluating a FLSA

claim, the Court must conduct a "thorough, fact-intensive analysis of the

employee's employment duties and responsibilities." *Schaefer-LaRose v. Eli

Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012). The employer carries the

burden of proving that an employee is exempt under FLSA; exemptions are to

be narrowly construed against the employer seeking the exemption. *See

Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974); *Schmidt v.

Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 631 (7th Cir. 2010). Determining

---

[3] A new rate was established. However, the previously established required salary of not less than $455 per week applied throughout Mr. Davis' employment.

the duties encompassed by an employee's position is a question of fact; determining the appropriate FLSA classification is a question of law. *Roe-Midgett v. CC Servs.*, 512 F.3d 865, 869 (7th Cir. 2008) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

MedXcel contends that the undisputed evidence shows that Mr. Davis' primary duty was management in nature, that he regularly directed the work of two other technicians, and that he participated in decisions to hire applicants and terminate employees. Dkt. 34 at 31–32. MedXcel argues that because Mr. Davis was the sole Facilities Supervisor at the Women's Hospital, his duties as a manager were necessarily more important than his duties to perform manual labor. *Id.* at 33.

Mr. Davis contends that his primary duties were not management. Dkt. 37 at 23–24. He argues that he only occasionally performed management tasks and that any managerial duties he once may have had were removed when Mr. Gordon became his supervisor in May 2016. *Id.* Additionally, Mr. Gordon considered his main tasks to be completing work orders and preventative maintenance orders. *Id.* at 25–26.

Under the FLSA, an employee's "primary duty" means the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a)[4]. The "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the

___

[4] A list of examples of "management" is provided in 29 C.F.R. § 541.102. The list is not exhaustive, and an employee need not perform each activity to satisfy the "primary duty" requirement.

character of the employee's job as a whole." *Id.* Factors to consider include, but are not limited to: "(1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; (4) and the relationship between the employee's salary and the wages paid to other employees for the kind of non-exempt work performed by the employee." *Id.*

Mr. Davis has designated evidence to show that his primary duties from May 2016 until July 2016 were not management in nature. For example, Mr. Gordon testified that Mr. Davis was responsible for completing work orders and past due work orders and ensuring the preventative maintenance orders were being completed. *See* dkt. 36-19 at 10 (Gordon Dep. 46:3–8).

Mr. Davis has also designated evidence that any supervisory authority he may have once had was removed once Mr. Gordon became his supervisor. Mr. Gordon testified that Mr. Davis was not responsible for budgeting, dkt. 36-19 at 33 (Gordon Dep. 116:12–14), or legal compliance, *id.* at 33–34 (116:17–117:1). Mr. Gordon testified that Mr. Davis did not set or adjust rates of pay for any employees, dkt. 35-4 at 29 (Gordon Dep. 115:18–22), he did not train employees, *id.* (115:15–17), and he did not develop strategic and operational policies or plans, *id.* at 26 (108:2–3). Mr. Gordon conducted performance evaluations for the facilities technicians and approved their time in the payroll system. *id.* at 27 (112:18–23). Mr. Gordon also testified that Mr. Davis did not attend meetings with hospital leadership, *id.* at 29 (Gordon Dep. 115:11–14). Based on the facts presented, a reasonable jury could find that Mr. Davis'

primary duties from May 2016 to July 2016 were not managerial.  *See Carlisle v. Dolgencorp, Inc.*, No. 1:10-cv-490-WTL-MJD, 2012 WL 1623039 (S.D. Ind. May 9, 2012) (denying summary judgment because reasonable jury could find that plaintiff's primary duty was not management).

Mr. Davis has presented evidence that could permit a reasonable jury to conclude that MedXcel improperly classified him as an exempt employee.  The parties agree that Mr. Davis' state law claim under the IWCS (Count IV) is tied to the FLSA claim so it survives only if the FLSA claim survives summary judgment.  *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 178 (7th Cir. 2011).  Accordingly, summary judgment on Mr. Davis' FLSA claim (Count III) and IWCS claim (Count IV) is **DENIED**.

### D. Hostile Work Environment

To the extent that Mr. Davis asserts a hostile work environment claim in his response to MedXcel's summary judgment motion, "[a] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."  *Speer v. Rand McNally & Co.,* 123 F.3d 658, 665 (7th Cir. 1997) (preventing plaintiff who identified a hostile work environment in a harassment complaint from proceeding on quid pro quo theory in response to motion for summary judgment).  Mr. Davis may not amend his complaint through his response to summary judgment.

**IV.**
**Conclusion**

Therefore, MedXcel's Motion for Summary Judgment is **DENIED.**  Dkt.

[33].

**SO ORDERED.**

Date: 9/30/2019

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Annavieve C. Conklin
DELANEY & DELANEY LLC
ACONKLIN@DELANEYLAW.NET

Emily L. Connor
LITTLER MENDELSON, P.C. (Indianapolis)
econnor@littler.com

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Alan L. McLaughlin
LITTLER MENDELSON, P.C. (Indianapolis)
amclaughlin@littler.com